EL PUEBLO DE PUERTO RICO, representado por el COMISIONADO DE INSTRUCCIÓN, HON. MARIANO VILLARONGA, demandante y apelado, *v.* CARMEN ANA AMADEO Y TORO, ET AL., demandados y apelantes.

Número 11389.

*Reasignado:* 11 de diciembre de 1957. *Resuelto:* 1 de marzo de 1961.

---

*Leopoldo Tormes García,* abogado de los apelantes de apellidos Amadeo Toro y Vendrell Toro; *Rafael Hernández Matos,* abogado de la Sucn. Bota; *Hon. Secretario de Justicia Hiram R. Cancio, (José Trías Monge, ex Secretario de Justicia,* en el alegato) y *Jaime J. Saldaña, Procurador Auxiliar,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

En este recurso de expropiación forzosa los recurrentes impugnan ciertos dictámenes del tribunal sentenciador sobre la admisión de algunas pruebas, así como la valoración que él fijó a los terrenos expropiados. Examinaremos los dos problemas separadamente.

I

*Primero:* Como parte de su prueba, los recurrentes ofrecieron una opinión y sentencia del antiguo Tribunal de Contribuciones en la cual se determina la tasación para fines contributivos de ciertos terrenos similares a los expropiados. El tribunal de instancia la rechazó por tratarse de una valoración distinta de la que correspondía establecer en el pleito. Consta en autos como prueba ofrecida y no admitida.

Intimamente relacionada con la oferta anterior, está la que hicieron los recurrentes del testimonio de un tasador del Departamento de Hacienda quien, con los documentos pertinentes a mano, habría de declarar sobre la valoración de las parcelas expropiadas que para fines contributivos había hecho el Departamento. Amparándose en la Regla 45 de las antiguas de Procedimiento Civil, los recurrentes habían

logrado que el secretario del tribunal expidiera una citación dirigida al Secretario de Hacienda o a su representante para que estos funcionarios comparecieran a prestar testimonio sobre los extremos ya descritos. El tribunal no permitió la declaración del testigo y sostuvo que era aplicable la Regla 34 y que los recurrentes no habían cumplido con los requisitos de justa causa y ausencia de otros remedios que ella exige. En vista de las consideraciones que a continuación expresamos, resulta superfluo resolver esta última cuestión procesal civil.

El problema de la admisibilidad de la tasación de una propiedad para efectos contributivos como prueba del valor de dicha propiedad para otros propósitos, ha sido considerado en sus múltiples aspectos en numerosas sentencias. *Valuation for taxation purposes as admissible to show value for other purposes*, 39 A.L.R. 2d 209 (1955) ; Jahr, *Eminent Domain*, 1957, págs. 235–240; 1 Orgel, *Valuation under the Law of Eminent Domain*, 1953, págs. 629–645; 5 Nichols, *Eminent Domain*, 1952, págs. 313–324. La abrumadora mayoría de los tribunales de los Estados Unidos ha resuelto que dicha tasación no constituye prueba directa competente del valor de una propiedad para otros propósitos que no sean los contributivos. Esta norma se ha seguido consecuentemente en procedimientos de expropiación forzosa, tanto en los tribunales federales como en los de los estados. Una ínfima minoría ha aceptado el criterio opuesto, pero aclarándose en muchos casos que la mencionada prueba, aunque admisible, es de muy escaso mérito probatorio. *State* v. *Barbe*, 24 So.2d 372, 373 (La. 1945) ; *United States* v. *Phillips*, 50 F. Supp. 454, 458 (D.C.Ga. 1943) ; *Fort Worth & D.S.P. Ry. Co.* v. *Gilmore*, 13 S.W.2d 416, 417 (Tex. 1928).

Cuando el poder expropiador es el que ha pretendido valerse del valor contributivo, los tribunales se han negado a aceptarlo aduciendo argumentos técnicos fundados en las doctrinas de la prueba de referencia, *res inter alios acta* y

la falta de participación del dueño en el procedimiento de tasación.(¹) *Suffolk & C. Ry. Co.* v. *West End Land & Improvement Co.*, 49 S.E. 350, 351 (N.C. 1904) ; *Girard Trust Co.* v. *City Philadelphia*, 93 Atl. 947, 948 (Pa. 1915) ; *Kansas City & G. Ry. Co.* v. *Haake*, 53 S.W.2d 891, 892–894, (Mo. 1932) ; *United States* v. *Certain Parcels of Land*, 261 F.2d 287, 289–291 (4 Cir. 1958). Sin embargo, tanto en esa situación como en aquella en la cual el dueño de la propiedad es quien ofrece la prueba, se ha aducido con gran énfasis la falta de confiabilidad de dicha prueba como índice del valor en el mercado y el conocido hecho de que las valoraciones contributivas responden a diversos propósitos y no únicamente a la precisa determinación del valor de la propiedad en el mercado. *Savannah Sugar Refining Co.* v. *Atlantic Towing Co.*, 15 F.2d 648, 650 (5 Cir. 1926) ; *Bankers Trust Co.* v. *International Trust Co.*, 113 P.2d 656, 660 (Colo. 1941) ; *State* v. *Barbe*, supra, pág. 373 (D.C. Cir. 1931) ; *In re Northlake Ave.*, 165 Pac. 113, 114 (Wash. 1917) ; 5 Nichols, *ob. cit.*, pág. 316; Jahr, *ob. cit.*, pág. 235. También se ha opuesto a la solicitud del dueño la conocida doctrina de que una determinación de un funcionario público no puede obligar al estado en un área de acción oficial fuera de la competencia de dicho funcionario. *In re Northlake Ave.*, supra, pág. 114. Un tribunal federal(²) ha expresado este argumento de manera convincente:

"El poder de un funcionario de contribuciones para obligar al público es limitado, y lo que él hace para propósitos contributivos no debe ser obligatorio para el público, o perjudicial al interés público, cuando otros funcionarios públicos están desempeñando una función pública muy diferente y en un campo no relacionado. Aunque el funcionario de contribuciones intente usar el valor en el mercado como criterio del valor de

---

(¹) En algunos estados, las leyes contributivas exigen a los dueños. someter una tasación de sus propiedades, generalmente bajo juramento. Luego en procedimientos de expropiación se aceptan esas declaraciones. como una admisión contra el propio interés. Algunos de los casos citados discuten ese problema. Como veremos más adelante, esas declaraciones. no se exigen en Puerto Rico bajo el sistema de tasación científica.

(²) *United States* v. *Certain Parcels of Land*, supra, pág. 291.

tasación, su interés primario se refiere a valores relativos, no absolutos; pero como quiera ejerza su criterio para propósitos de una justa distribución del peso de las contribuciones, su actuación, por ser una declaración extrajudicial, no puede circunscribir el interés del público en el difícil proceso de determinar la justa compensación por propiedad tomada para el uso público."

Conviene ahora examinar con suma brevedad algunos aspectos del sistema vigente de tasación de la propiedad para efectos contributivos. Por autorización de la Ley núm. 117 de 9 de mayo de 1947 (*Leyes*, pág. 263, 13 L.P.R.A. sec. 431 et seq.) se estableció en Puerto Rico un sistema llamado de "tasación científica", el cual produjo una tasación general en 1951 y una revaloración en 1958–59.

La tasación científica de la propiedad, tanto en Puerto Rico como en otras jurisdicciones, no se hace con el propósito de determinar fielmente el valor en el mercado de la propiedad inmueble. El art. 2 de la citada ley ordena al Secretario de Hacienda "establecer normas de valoración y tasación con tal exactitud y detalles científicos, que permita fijar tipos adecuados y equitativos de valoración de la propiedad para fines contributivos". El art. 3 añade que "clasificará y tasará toda la propiedad inmueble en su valor real y efectivo utilizando cualquiera de los métodos y factores reconocidos en materia de valoración o tasación de la propiedad, de manera que las tasaciones para cada uno de los distintos tipos de propiedad resulten uniformes." (3) Las publicaciones oficiales señalan como objetivos de la tasación científica los de establecer un sistema equitativo de valoración para fines contributivos, la uniformidad en la tasación y "valores unitarios de tasación basados en el valor de la propiedad en el mercado." (4) Es obvio que los administradores del sis-

---

(3) El Código Político (art. 295) ordenaba al Secretario "tasar la propiedad en su valor real y efectivo considerando todos los factores en materia de valoración o tasación, incluyendo el valor en el mercado, sin tener en cuenta una venta forzada." (13 L.P.R.A. sec. 447.)

(4) Departamento de Hacienda, *Tasación y Revaloración de la Propiedad Inmueble*, 1958 pág. 5. En el caso de las edificaciones hay la difi-

tema tendrán continuamente que realizar ajustes para armonizar esos tres objetivos. Es conocido, además, el hecho de que todo sistema contributivo tiene indispensablemente que ser sensible a las necesidades económicas y políticas de la comunidad a la que sirve, y que esa sensibilidad necesariamente aumenta en el caso de la tasación de la propiedad inmueble, debido a que ella es la base de la capacidad prestataria del estado. Es por estas razones que una reconocida autoridad en el campo de la hacienda pública afirma que el propósito de un sistema de tasación científica no debe ser el de determinar el valor real de la propiedad, sino el de establecer una base razonable y equitativa para las contribuciones. Taylor, *The Economics of Public Finance*, 1953, pág. 301. Contrario a lo anterior, a los tribunales se les requiere realizar en casos de expropiación forzosa, una intensa y rigurosa búsqueda que compruebe de la manera más precisa posible el valor en el mercado de una determinada propiedad al momento en que ocurre la incautación oficial.

Podría afirmarse, sin embargo, que aun aceptando la anterior diferencia entre los objetivos de los dos tipos de valoración, todavía la tasación contributiva sería de alguna utilidad si el propietario es quien la ofrece como una expresión mínima del valor de la propiedad en el mercado, a ser evaluada junto a la demás prueba pertinente. Cf. *Louisiana Highway Commission* v. *Giaccone*, 140 So. 286, 290 (La. 1932).

Esta propuesta no salva, desde luego, algunos de los obstáculos técnicos aplicables a la valoración contributiva, que como hemos visto, ha señalado la jurisprudencia de los.

cultad adicional de que el valor en el mercado se establece por medio del "costo de reproducción depreciado", y no por el de comparación de las ventas similares en el mercado, que, como sabemos, es el que prevalece en el campo de las expropiaciones. Departamento de Hacienda, *¿Qué es la Tasación Científica?* pág. 14. Las diferencias en técnicas y resultados que produce el uso de uno u otro método se discuten en *Tax Assessment of Real Property: A proposal for Legislative Reform*, 68 Yale L.J. 335,. 344–347 (1958).

Estados Unidos, [5] pero sí mantiene su efectividad cuando el propietario, como en el caso presente, lo que ofrece es el testimonio de un funcionario que intervino en el procedimiento de tasación, y no simplemente una certificación de ésta. Debemos, por lo tanto, examinar el mencionado procedimiento de tasación.

La manera como se realizó la tasación de 1951 por los empleados responsables de ella, ha sido descrita del siguiente modo en una publicación oficial:

"En el nuevo sistema para valorar una propiedad intervienen muchas personas, unos hacen una cosa y otros hacen otras, hasta llegar al valor de tasación.

"Unos preparan las tablas de valores unitarios después de muchos estudios e investigaciones, otros visitan las propiedades y apuntan en unas tarjetas las medidas y otros detalles sobre cada propiedad, otros clasifican la propiedad dejándose llevar por todos los detalles que aparecen en la tarjeta y finalmente las tarjetas llegan a la oficina central donde otro grupo de empleados multiplican los costos o valores unitarios por las medidas o detalles que aparecen en las tarjetas para así llegar al valor tasado de la propiedad." [6]

Como podrá observarse, la tasación científica de una propiedad es un esfuerzo colectivo de los empleados de un organismo del gobierno y no la labor de una sola persona. Más aún, los "costos" o "valores unitarios" que sirven de base para determinar el valor de la propiedad en el mercado, se obtuvieron luego de extensas investigaciones en diversas fuentes, pero en especial de largas conversaciones con expertos en la materia y utilizando el asesoramiento de una comisión nombrada para esos propósitos. Al revalorarse la propiedad unos seis años más tarde, "no hubo necesidad de

[5] *United States* v. *Certain Parcels of Land,* supra, pág. 291.

[6] *¿Qué es la Tasación Científica?* pág. 28. Tanto en ese folleto como en el titulado *Tasación y Revaloración de la Propiedad Inmueble,* (1958) se describe ampliamente el procedimiento que se adoptó. Examínese, además, de Pedro, *La Tasación Científica,* 13 Rev. Colegio de Abogados de Puerto Rico 385 (1950). Para una explicación más detallada y técnica, véase Department of the Treasury, *Procedures for Real Property Assessment in Puerto Rico* (1953).

volver a inspeccionar detalladamente las propiedades una por una. El inventario físico de cada propiedad ya había sido tomado al tasarse cada propiedad por primera vez bajo el Sistema de Tasación Científica. Sólo era necesario reajustar los valores anteriores según el cambio en valor verificado durante los últimos años." (7)

Por consiguiente, una sola de las personas que intervinieron en ese complicado procedimiento, no sería competente, aun cuando desempeñara una función directriz, para ofrecer testimonio, de propio conocimiento, sobre todos los elementos que integran la tasación contributiva, cuando ésta se ofrezca como prueba del valor de la propiedad expropiada. Para salvar ese escollo habría que ofrecer al tribunal el testimonio de todas las personas que de una u otra manera participaron en el procedimiento. En la hipótesis, altamente improbable, de que eso pudiera lograrse, habría que reproducir en los pleitos de expropiación todos los detalles del procedimiento de tasación contributiva. Esa prueba, desde luego, tendría que permitírsele tanto al propietario como al expropiador.

En suma, el sistema de tasación de la propiedad inmueble para fines contributivos no persigue una valoración completamente individualizada de cada propiedad para determinar con la mayor precisión posible su valor real en el

---

(7) *Tasación y Revaloración de la Propiedad Inmueble,* pág. 18. Obsérvense, además, los efectos que tienen las normas generales de depreciación sobre el valor en el mercado. "Establecido ya para cada propiedad su valor en el mercado tanto de la tierra como de las estructuras, sólo nos restaba hacer el ajuste final para establecer el valor sobre el cual se impondría la contribución para los próximos años hasta que se practique la próxima revaloración general. Estimando que podría tomarse de siete hasta diez años sin que se vuelva a practicar una revisión general de los valores de las propiedades para fines contributivos, se determinó que era conveniente reajustar el valor en el mercado actual acreditando a cada edificación una depreciación adelantada por el número de años durante la cual no se vuelva a hacer una revisión general de la valoración. Igualmente se estimó prudente hacer un ajuste hacia abajo correspondiente al valor de los terrenos ante la eventualidad de que éstos deprecien en su valor durante los próximos años y así evitábamos hasta lo más posible que el valor para fines contributivos que se le fijara una propiedad sobrepasara durante los próximos años a su valor en mercado." Id. pág. 22.

mercado, sino que por el contrario se funda en normas y criterios de aplicación general a propiedades similarmente situadas, y tiene otros objetivos adicionales y responde a necesidades económicas y políticas que no pueden tener peso alguno en una valoración para fines de expropiación forzosa. La determinación final de esa valoración contributiva resulta de un procedimiento complejo en el cual intervienen de manera directa numerosas personas. La escasa luz que en casos aislados pudieran ofrecer esa determinación oficial o el testimonio sobre ella, en modo alguno compensaría las confusiones y tardanzas— "una concesión a la brevedad de la vida", como dijera Holmes—que necesariamente se producirían cuando el escalpelo del contrainterrogatorio penetre profundamente en la compleja anatomía de ese sistema para entresacar de ella los elementos que sean persuasivos en el pleito de expropiación. Es este un ejemplo claro de prueba técnicamente admisible que no debe aceptarse por poderosas razones de índole normativa.[8]

Además, un examen de las disposiciones legales aplicables comprueba que la Asamblea Legislativa estuvo consciente de las dificultades que hemos descrito. El art. 3 de la citada Ley de 1947, según enmendada por la Ley núm. 228 de 5 de mayo de 1950 (*Leyes*, pág. 581, 13 L.P.R.A. sec. 432) dispone en su oración final que: "Las planillas, tarjetas, planos, mapas, fotografías, tablas, gráficas, y toda la documentación e información obtenida y usada por el Secretario de Hacienda para clasificar, valorar y tasar las propiedades, por el método científico que esta ley ordena serán evidencia y constituirán prueba prima facie, *para fines contributivos,* de las circunstancias y del valor de tasación de la propiedad

---

[8] Examínese la Regla 303 de las *Reglas de Evidencia para el Tribunal General de Justicia,* adoptadas por este Tribunal Supremo y remitidas a la Asamblea Legislativa a principios del presente año; la Regla 303 en American Law Institute, *Model Code of Evidence,* 1942 pág. 180; la Regla 45 en National Conference of Commissioners on Uniform State Laws, *Uniform Rules of Evidence,* 1953 pág. 189; y James, *Relevancy, Probability and the Law,* en Association of American Law Schools, *Selected Writings on the Law of Evidence and Trial,* 1957 pág. 610.

a que se refieran, y como tal deberán ser admitidos en evidencia por las cortes de Puerto Rico; *Disponiéndose*, que el Secretario de Hacienda o cualquier agente designado por éste podrá testificar sobre la información contenida en tal evidencia y su relación con el valor de la propiedad a que se refiere." (Énfasis suplido.) La expresión legislativa que ordena circunscribir esa prueba a los "fines contributivos", está sujeta a otras disposiciones legales aun en la propia esfera de las contribuciones. Así, por ejemplo, en el caso de la contribución sobre herencias y donaciones, la ley pertinente faculta al Secretario de Hacienda a ordenar que se tasen "por su valor en el mercado a la fecha del fallecimiento o de la donación, según sea el caso, los bienes de fallecidos y los bienes que sean donados o que sean objeto de tasación". 13 L.P.R.A. sec. 895. Es sabido que esa tasación especial se realiza en todos los casos. También, en el área de la contribución sobre ingresos pueden citarse ejemplos de tasaciones especiales que deben llevarse a cabo en cierto momento y con el fin de obtener el "valor en el mercado" de determinadas propiedades.[8a] Véanse los arts. 23 (*m*)–7, 23 (*m*)–25 y 113 (*a*) (2)–1 del Reglamento Relativo a la Ley de Contribuciones Sobre Ingresos de 1954 (1958).

Por las razones señaladas en la jurisprudencia de los Estados Unidos que hemos reseñado y las realidades del sistema de tasación nuestro que hemos descrito, fallamos que las determinaciones oficiales sobre valoración para los efectos de la contribución sobre la propiedad,[9] y los documentos o testimonios sobre esas determinaciones, no constituyen prueba admisible del valor en el mercado en pleitos de ex-

---

[8a] No es necesario, desde luego, resolver en este caso si es o no admisible prueba sobre la valoración para fines de la contribución sobre la propiedad en pleitos relacionados con otras contribuciones.

[9] Esta norma es aplicable, *a fortiori*, cuando, como ocurre en este caso, una de las pruebas que se ofrece es el valor contributivo de una propiedad supuestamente similar a la expropiada.

propiación forzosa. No cometió, pues, el tribunal de instancia los errores que se le imputan.

■■ *Segundo:* Los recurrentes se quejan, además, de la actuación del tribunal de instancia al negarse a admitir algunas pruebas de supuestas ventas similares ofrecidas por ellos y al aceptar otras que sometiera el recurrido. Antes de considerar estos extremos, es necesario ofrecer una breve descripción de las parcelas expropiadas.

La primera o parcela A tiene una cabida de 1.1980 cuerdas y la segunda o parcela B, una de 4.9955 cuerdas. Colindan entre sí y están localizadas, con un frente de 223 metros, en el kilómetro 23, hectómetro 3 de la Carretera Estatal núm. 23 que conduce de Ponce a Guayanilla, a unos 400 metros de la calle Villa y como a 200 metros de la Avenida Roosevelt. Frente a la parcela B y al otro lado de la Carretera núm. 23 quedan parte de una extensión del caserío público Rosaly, un edificio de dos plantas en el cual hay un negocio de "lechonera", cantina y baile, y tres casitas de madera de escaso valor. También frente a las parcelas expropiadas hay un predio sembrado de caña que se extiende en unos 200 metros hasta una urbanización de tipo moderno construida por la Fullana Corporation. Por el norte colindan con un camino privado de tierra y gravilla que las separa de la barriada Baldorioty, una urbanización de "servicios mínimos" habitada por personas de bajos ingresos. Por el sur y oeste colindan con una zona agrícola dedicada al cultivo de caña. Como a 150 metros hacia el sur de las parcelas hay una escuela vocacional y como a 400 metros está el nuevo parque atlético de la ciudad.

El tribunal sentenciador concluyó, además, que:

"Desde las parcelas expropiadas se puede ir por cinco centavos a cualquier sitio de la ciudad de Ponce. Relativamente cerca les quedan iglesias, hospitales, farmacias, escuelas y establecimientos comerciales e industriales.

"La Carretera Núm. 23, que, repetimos, pasa frente a las parcelas expropiadas, mide alrededor de 13 metros de ancho y está desde luego asfaltada.

"Tienen acceso ambas parcelas a las líneas de luz y de teléfono, y a los sistemas de acueducto y de alcantarillado pluvial y de aguas negras que pasan por ese tramo de la carretera.

"También a lo largo de la parcela B corría a la fecha de la expropiación, de norte a sur en una extensión de 70 metros, una acera de hormigón de 3 metros de ancho. Había además frente a ambas parcelas dos bocas de incendio en uso.

"Las dos parcelas quedan al mismo nivel de la carretera. Tienen una topografía llana con un ligero desnivel al noroeste que les da un buen desagüe natural.

"Las dos parcelas se dedicaban a la fecha de la expropiación al cultivo de caña de azúcar (al igual que los terrenos de las fincas principales de que fueron segregadas con las que colindaban por el oeste y el sur). Pero el mejor uso a que podían adaptarse ambas parcelas expropiadas era para el desarrollo de una urbanización residencial. Para ello hubiera sido necesario construir calles y aceras, llevar los servicios de luz, agua y alcantarillado e incurrir en otros gastos de desarrollo, a un costo de $2.25 a $2.50 por metro cuadrado."

Los recurrentes sostienen que el valor en el mercado de las parcelas expropiadas es de $2 el metro cuadrado, mientras que los recurridos y el tribunal de instancia las valoran a razón de $0.75 el metro cuadrado.

Se alega, en primer término, que el tribunal incidió en error al no admitir prueba documental de una transacción entre el Sr. Luciano Martiniano García y el Asilo de Damas. La parcela objeto de esa transacción es de cabida y topografía similares a las de las expropiadas y queda relativamente cerca de ellas, pero ubica en la Calle Villa, en un sector de gran desarrollo comercial e industrial y rodeada de importantes establecimientos. Por esa esencial diferencia de ubicación no se admitió la prueba documental. Al así hacerlo, el tribunal actuó correctamente. *Autoridad Sobre Hogares* v. *Viera*, 72 D.P.R. 732, 737 (1951); *E.L.A.* v. *Bravo*, 79 D.P.R. 779, 785 (1956).

Tampoco hubo error al rechazarse dos documentos ofrecidos por los demandados y que contenían copias de las sentencias del Tribunal Superior, Sala de Ponce, en casos de

expropiación forzosa de parcelas supuestamente similares a las que examinamos en el presente recurso. En *Pueblo* v. *Colón*, 73 D.P.R. 579, 588–589 (1952) explicamos las razones por las cuales esa prueba es inadmisible.

Objetan también los recurrentes las resoluciones del tribunal que admitieron una venta de la Ponce Cement Corp. a la Fullana Corp., otra de Telares de Puerto Rico, Inc. a la Compañía de Fomento Industrial y otra de La Reparada Development Co. a Long Construction Co. Sostienen, en síntesis, que existen importantes diferencias de cabida, ubicación, facilidades, condiciones del terreno, etc. entre las parcelas afectadas por esas transacciones y los predios expropiados que impedían la aceptación de aquellas como ventas similares. El tribunal no menciona en sus conclusiones las ventas de Telares[10] y La Reparada, por lo que debemos concluir que no les dio peso alguno. Aunque la propiedad vendida por la Ponce Cement Corp. a la Fullana Corp. es diferente de las expropiadas en varios aspectos[11] ciertamente el tribunal no abusó de sus facultades al admitir el documento de venta.

## II

 Los recurrentes impugnan el valor que el tribunal asignó a las parcelas expropiadas, por creer que su apreciación de la prueba fue errónea. Objetan tanto la consideración específica que se dio a ciertos elementos como la evaluación general de toda la prueba admitida.

*Primero:* En cuanto al primer aspecto, la objeción inicial se refiere a una venta de una parcela de la Ponce Cement Corp. a la Compañía de Fomento Industrial realizada a razón de $4,500 la cuerda, poco menos de un mes antes de la fecha de incautación de las parcelas expropiadas por el

---

[10] La venta de Telares no fue admitida por el tribunal como un ejemplo de venta similar sino como una venta utilizada por el perito de los recurridos para comprobar, más bien por vía de contraste, su juicio sobre el valor de los terrenos expropiados. En vista de las circunstancias, es innecesario discutir esta actuación del tribunal.

[11] Véase, *infra*, págs. 120–122.

estado. Se admitió como una venta similar, pero al emitir su fallo el tribunal se negó a considerarla porque "según lo declarado por el propio perito de los demandados, el mejor uso de esta parcela era el industrial."

La parcela en cuestión tiene una cabida de 3.39 cuerdas, y está ubicada en el Barrio Canas, ([12]) como a 1.7 kilómetros de las expropiadas. Es muy similar a éstas en cabida, topografía, calidad de los terrenos, facilidades de transportación, electricidad, agua y acceso a otros servicios públicos y a establecimientos comerciales. De las transacciones admitidas, es la más cercana en fecha a la expropiación. Está más retirada del centro de la ciudad que las parcelas expropiadas y tiene la desventaja de no dar frente a la carretera, por lo que es necesario usar un callejón para llegar a ella.

Estimamos que el tribunal de instancia erró al no concederle valor probatorio alguno a esta venta por el solo hecho de que el mejor uso de la parcela "era el industrial", mientras el de las expropiadas era el residencial. Es ésa, sin duda, una diferencia importante a la cual corresponde darle el peso que merece, pero en vista de las notables semejanzas ya reseñadas, no es por sí sola suficiente para descartar esta prueba, máxime cuando se probó que las parcelas expropiadas eran también susceptibles de ser usadas para una industria, y que no existía al momento de la incautación una prohibición oficial de tal uso. ([13]) Cf. *E.L.A.* v. *Ocean Park Development Corp.*, 79 D.P.R. 158, 170–173 (1956).

---

([12]) Ese es el mismo barrio donde están las parcelas expropiadas.

([13]) Los recurridos encuentran apoyo adicional para el dictamen del juez sentenciador en el hecho de que la parcela de la Ponce Cement Corp. ubica en la Calle Villa. Aparte de que el tribunal no fundó su fallo en esa circunstancia, está el hecho de que no hemos encontrado en el expediente prueba de que la ubicación exacta de esa parcela, aunque en una calle de mayor importancia que la de las expropiadas, fuera en verdad tan disimil de la de éstas, que como en el caso de la parcela del Asilo de Damas, requiriese que no se le diera consideración alguna. Debe recordarse que la prueba demostró que hay importantes diferencias en los valores de las propiedades de la Calle Villa, dependiendo del sitio donde se encuentren y que además, la Calle Villa atraviesa la ciudad y es la salida de Ponce hacia varios pueblos.

■ El tribunal admitió una venta de la Porto Rico Iron Works a la Autoridad de Hogares de Puerto Rico, pero en sus conclusiones resolvió que aunque se "asemeja bastante" a las parcelas expropiadas, no podía darle "gran peso" a la transacción porque "(a) la compradora tenía la facultad de expropiar, (b) de la contigüidad de los terrenos a los del caserío Ponce de León puede inferirse la existencia de una necesidad o conveniencia especial para la compradora y (c) la parcela tiene dos frentes, uno que da para la Carretera Núm. 23 y otro que da para la Avenida Roosevelt, la cual es una avenida de primera clase." La parcela en cuestión es una de 13.1225 cuerdas, ubicada frente a las expropiadas, al otro lado de la carretera. En 1946 fue vendida a $5.109 la cuerda. En su topografía, facilidades y accesos es similar a las expropiadas pero sus terrenos son inferiores (salitrosos, "poyalosos") y colinda en parte con el arrabal Palo de Pan y con la vía del ferrocarril.

En *Autoridad sobre Hogares de Puerto Rico* v. *Valdejullí,* 71 D.P.R. 640, 642 (1950) resolvimos que las ventas hechas a entidades que poseen el poder de expropiación "deben mirarse con más cautela que aquéllas hechas a personas que no tengan la autoridad de expropiar. Toca a la persona que las ofrece demostrar que fueron hechas libre y voluntariamente, aunque ayudadas por la presunción de que, como otras, no fueron obtenidas mediante coacción. Pero una vez se determina que fueron voluntarias, deben ser consideradas igual que otras ventas; v.g., deben admitirse si se determina que fueron ventas contemporáneas de propiedades similares."

Los demandados ofrecieron el testimonio del Sr. Luis Ferré, vicepresidente de la entidad vendedora, quien en síntesis declaró que la venta había sido completamente voluntaria, que no había habido presiones ni amenazas de expropiación, que las conversaciones duraron varias semanas y que originalmente se pidió un precio más alto pero luego se hizo una rebaja al conocerse el propósito para el cual se

adquiría la parcela. Entendemos que este testimonio incontrovertido se ajusta a la norma establecida en el caso de *Valdejulli*, comprueba que la venta fue voluntaria,([14]) y debilita grandemente el argumento del "comprador especial". Además, los últimos dos factores mencionados por el tribunal se compensan en parte por las ventajas ya indicadas que tenían las parcelas expropiadas sobre la de la Porto Rico Iron Works, y por el alza general en la valoración de los terrenos de la ciudad de Ponce de 1946 a 1951. Fallamos, por consiguiente, que el tribunal erró al no concederle peso alguno a esta venta.([15]) Como veremos más adelante, esto fue lo que en realidad hizo.

■ El tribunal admitió prueba documental sobre la venta de una parcela de Arturo Febry a La Rambla Development Corp., realizada en 1948 por la suma de $5,158.12; pero finalmente resolvió no darle "peso probatorio alguno" porque "aparte de la diferencia en cabida entre esta parcela y las expropiadas, la compradora adquirió dicha parcela para ampliar la Urbanización La Rambla" y era por tal razón "un comprador especial."([16]) La parcela de Febry tiene una cabida de 1716.04 metros cuadrados y ubica en un extremo de Ponce opuesto a aquél donde están las parcelas

---

([14]) Durante la vista del pleito, los recurridos solicitaron la eliminación del testimonio del señor Ferré, en razón de que éste no había sido la persona que había firmado la escritura a nombre de la entidad vendedora. Este planteamiento específico nunca fue resuelto y se admitió la venta "por el valor probatorio que pudiera tener". Nada hay en el expediente que pruebe o tan siquiera sugiera que el señor Ferré no tuviese conocimiento directo y personal de los hechos que relató.

([15]) Los recurrentes también impugnan una resolución del tribunal negándose a admitir, como venta similar, una transacción entre la Autoridad Sobre Hogares de Puerto Rico y la Autoridad Sobre Hogares de Ponce que envolvía la parcela vendida por la Porto Rico Iron Works. Esa transacción se realizó por el mismo precio de la venta anterior. Considerado nuestro dictamen sobre la primera venta, es innecesario resolver si constituye o no error la negativa del tribunal a admitir la segunda.

([16]) No hay prueba específica en el expediente sobre la manera en que esta situación afectó el precio de venta. La inferencia que hizo el tribunal, aunque es obviamente correcta, no constituye base suficiente para decretar que la venta fue involuntaria. Cf. *Pueblo* v. *Colón*, supra págs. 583-586; *Pueblo* v. *Sucn. Rabell*, 72 D.P.R. 574, 581 (1951).

expropiadas, y como a tres kilómetros del centro de la ciudad. Las zonas son, sin embargo, muy similares, al igual que la topografía, facilidades, servicios y accesos de las parcelas y el mejor uso al cual podían destinarse. Contrario a las expropiadas, la de Febry no tenía servicio de alcantarillado. Aunque los motivos que tuvo el tribunal son meritorios, no creemos, atendidas las demás circunstancias, que puedan por sí solos destruir todo el valor de esta prueba. Algún peso debió dársele.

█ El tribunal admitió, también, tres ventas de solares ubicados en las cercanías de las parcelas expropiadas y les dio peso como índice del valor de los solares en la zona pero no como "índice adecuado de las parcelas expropiadas", por tratarse de "solares aislados que no forman parte de un desarrollo urbano y su cabida reducida aumenta su valor unitario." Uno de los solares era de 984 metros cuadrados y se había vendido en 1948 a $1.52 el metro cuadrado; otro era de 707.84 metros cuadrados y se había vendido en 1950 a $3.18 el metro cuadrado, mientros uno contiguo de 638.75 metros cuadrados se vendió en la misma transacción a $2.81 el metro cuadrado; y otro de 3,377.61 metros cuadrados se había vendido unos meses antes de la expropiación a $2.72 el metro cuadrado. Aparte de la cabida, los solares guardan en sus demás atributos gran similitud con las parcelas expropiadas.[17]

No es posible determinar el efecto persuasivo que en la mente de un juzgador pueda tener una venta considerada como "índice del valor de los solares en la zona" en oposición a la misma venta considerada como "índice del valor de los terrenos expropiados."[18] No intentaremos hacerlo. En todo caso, es necesario recordar que en varios pleitos hemos aprobado resoluciones de los tribunales de instancia que admi-

---

[17] Tres de estos solares no tenían acceso al sistema de alcantarillado.

[18] No es éste, desde luego, el caso de solares cercanos a los terrenos expropiados, pertenecientes a una urbanización en pleno desarrollo, y cuyo precio se utiliza como índice del valor de una parcela yerma susceptible e uso residencial, luego de deducirse "los costos de urbanización, la reduc-

tían y daban peso, como prueba de ventas similares, a ciertas transacciones sobre parcelas que tenían notables diferencias de cabida con las expropiadas en dichos pleitos, pero que guardaban semejanzas con ellas en otros aspectos.[19]

■ ■ *Segundo:* Los recurrentes objetan la apreciación general de la prueba que hizo el tribunal, fundándose en que éste dio peso decisivo, en el aspecto de ventas similares,[20] a dos transacciones realizadas el 29 de septiembre de 1950 entre la Ponce Cement Corp. y la Fullana Corp., y descartó prácticamente toda la demás prueba. Tienen razón los recurrentes.

Las mencionadas transacciones cubren dos parcelas vendidas a la Fullana Corp., una de 25.876 cuerdas a $2,500 la cuerda y otra de 29.451 cuerdas a $3,400 la cuerda. Además del precio pagado, la compradora se obligó a "pavimentar con cemento"[21] todas las calles de la urbanización que habría de edificar, y a construir por su cuenta, y "también de cemento", la prolongación de las calles de dicha urbanización hasta un predio propiedad de la vendedora, reservado para la construcción de una avenida, y a través de una faja de 40 metros de ancho perteneciente también a la vendedora.

ción del área que resulta de la lotificación y una ganancia razonable para el iniciador del proyecto." *E.L.A.* v. *Ocean Park Development Corp.,* supra, págs. 162–163; *United States* v. *Iriarte,* 166 F.2d 800, 804 (1. Cir. 1948).

[19] *Pueblo* v. *Carmona,* 70 D.P.R. 312, 317 (1949)—predios de 200, 400 y 1,000 metros cuadrados comparados con una cabida de 1.90 cuerdas que tenían las parcelas expropiadas; *Pueblo* v. *Sucn. Quiñones,* 71 D.P.R. 261, 264 (1950)—solares de 300 metros cuadrados comparados con 2,947.79 metros cuadrados; *Pueblo* v. *Colón,* supra, págs. 581–583—877 metros cuadrados comparados con 12,402.05 metros cuadrados.

[20] El tribunal concedió también peso a las circunstancias peculiares imperantes en el mercado de terrenos de la ciudad de Ponce. Esa actuación es enteramente correcta. En cuanto a este aspecto, el tribunal concluyó que en Ponce la demanda por terrenos para urbanización había sido relativamente estable, que la ciudad tenía alrededor de 4,000 cuerdas de terreno llano para su expansión urbana y que esto "opera contra el valor de los terrenos disponibles frente a la demanda relativamente estable."

[21] Debe recordarse que la corporación vendedora se dedica a la manufactura y venta de cemento en la ciudad de Ponce.

No hay prueba en el expediente sobre el monto de esta obligación, pero sin duda su cumplimiento tiene que haberle significado considerable beneficio a la vendedora. Además, la compradora tuvo que adquirir un solar y un edificio ubicados en la Avenida Hostos para darle salida por ahí a las parcelas.

Las mencionadas parcelas están situadas a unos 150 metros de las expropiadas. Tienen algunas semejanzas con éstas en topografía, facilidades, accesos y mejor uso de los terrenos. Les aventajan en localización por estar más cerca de la Urbanización Mariani y de los terrenos de la Universidad de Santa María, pero a la vez están en desventaja en ciertos aspectos. Colindan por un lado con el arrabal Palo de Pan y por otro con el terminal del tren, lo cual en opinión de los peritos reduce su valor para propósitos residenciales. En uno de sus extremos tienen un caño o zanjón, lo que también afecta el precio adversamente. Los servicios urbanos de electricidad, agua y sanitarios no están directamente al frente como ocurre con las parcelas expropiadas, sino en la Urbanización Mariani y la Avenida Hostos y esto requiere gastos adicionales para llegar a ellos. No tienen acceso al servicio de teléfonos. En suma, aunque la venta de estas parcelas fue correctamente admitida como prueba de una venta contemporánea de propiedad similar, no creemos que debió dársele el peso decisivo, prácticamente concluyente, que le otorgó el tribunal de instancia. La notable diferencia en cabida entre ellas y las expropiadas,[22] las particularidades del "precio" de venta y los otros elementos que hemos reseñado, aconsejaban más bien concederle mérito relativo junto a las demás transacciones que podían iluminar el criterio del juzgador.

[22] Además de las diferencias en cabida que existen entre las parcelas expropiadas y las de Fullana, tomadas éstas individualmente, conviene recordar que la Ponce Cement Corp. vendió a la Fullana Corp. las dos parcelas—que suman unas 55 cuerdas—en la misma transacción. Es razonable la inferencia, sugerida por los recurrentes, de que esa venta combinada afectó adversamente el precio de venta.

Es sabido que no existen dos propiedades que sean idénticas y que el método comparado sólo requiere semejanzas y no igualdad. Por ese y otros motivos, en pleitos de esta clase ordinariamente descansamos en el ejercicio de la informada discreción del tribunal sentenciador, quien tiene la oportunidad de aquilatar, a menor distancia que nosotros, los variados elementos que deben integrar un juicio de valoración. Y en repetidas ocasiones hemos resuelto que no habremos de intervenir con esa discreción, aun cuando el tribunal se hubiese equivocado en algunos fallos sobre la admisión de pruebas, siempre que su juicio de valoración encontrase suficiente apoyo en la prueba admitida. *E.L.A.* v. *Bravo*, supra, pág. 787; *Autoridad Sobre Hogares* v. *Colón*, 73 D.P.R. 215, 221 (1952) ; *Pueblo* v. *Carmona*, supra, pág. 316; *Pueblo* v. *Lamboglia*, 70 D.P.R. 810, 817 (1950). No obstante, creemos que en el presente caso el juzgador circunscribió injustificadamente el ámbito de su exploración final a prácticamente una sola de las ventas similares y desechó, sin necesidad, varias otras de parecida fuerza persuasiva. Las ventas similares constituyen, como sabemos, la prueba principal del valor en el mercado en pleitos de expropiación. *Autoridad Sobre Hogares de Puerto Rico* v. *Valdejulli*, supra, pág. 643. En el presente litigio prácticamente no existe otra, porque la referente al mercado de terrenos en la ciudad de Ponce es, por su carácter general, de índole complementaria, y porque el criterio de valoración de los peritos de ambas partes se fundó mayormente en la autoridad que cada uno concedió a las ventas similares.[23]

Estamos convencidos, por las razones ya señaladas, que el tribunal de instancia incurrió en "error manifiesto" en la apreciación de la prueba y que su fallo perjudicó el derecho de los recurrentes a recibir una justa compensación por las parcelas expropiadas. Cf. *Autoridad Sobre Hogares de Puerto Rico* v. *Valdejulli*, supra, pág. 644. Corresponde, po

[23] El juez sentenciador hizo también una inspección ocular de la parcelas expropiadas.

lo tanto, devolver el expediente al tribunal de instancia para que a la luz de los criterios expresados en esta opinión se hagan nuevas conclusiones de hecho y de derecho y se dicte una nueva sentencia.

*Se revocará la sentencia recurrida y se devolverá el caso para procedimientos ulteriores compatibles con esta opinión.*

Los Jueces Asociados Sres. Hernández Matos y Blanco Lugo no intervinieron.

Opinión disidente en parte del Juez Asociado Sr. Santana Becerra.

No me es posible concurrir en aquella parte de la opinión del Tribunal que declara "que las determinaciones oficiales sobre valoración para los efectos de la contribución sobre la propiedad, y los documentos sobre esas determinaciones, no constituyen prueba admisible del valor en el mercado en pleitos de expropiación forzosa", y que a mi juicio elimina dicha evidencia de manera absoluta cualesquiera que pudieran ser las circunstancias en cada caso en particular, ya se produjere a través de la declaración de testigos o ya mediante el certificado oficial de la tasación. Con mi mayor deferencia al criterio de la mayoría no me parece, por las razones que voy a exponer, que tal norma de exclusión absoluta de esta evidencia se justifique en Puerto Rico, y aún menos en circunstancias como las del caso de autos.

En lo que ahora concierne, el récord en este caso de expropiación demuestra que los demandados solicitaron por escrito la citación del testigo Sr. Carlos Archevald, del Negociado de Tasaciones de la Secretaría de Hacienda con oficina en Ponce para que compareciera a testificar "trayendo consigo todas las hojas de trabajo (working sheets), papeles e informes, que obren en su poder y que se refieran a la tasación que él practicara en su calidad de funcionario de la Secretaría de Hacienda de Puerto Rico, con relación a las parcelas de dichos demandados objeto de expropiación", . . . El demandante había solicitado también por escrito que se dejara sin

efecto dicha citación porque (*a*) de la faz de la misma no surgía la "relevancia" o pertinencia de la prueba solicitada y se requería que se demostrara justa causa al tribunal por lo cual la evidencia era indispensable, invocando a tal efecto las Reglas 45 y 34 de las de Enjuiciamiento Civil (1943) y lo decidido en el caso de *Cortés* v. *Corte*, 65 D.P.R. 166; (*b*) porque no procedía la producción de los documentos ni el testimonio solicitado por cuanto los mismos gozaban de inmunidad por constituir materia privilegiada y la misma no ser admisible en evidencia, y (*c*) porque un funcionario público no podía ser obligado a testificar adversamente contra los intereses del gobierno a quien representaba. Al ser llamado en el curso del juicio el testigo Sr. Archevald, para que declarara, hubo una amplia discusión de las objeciones de la parte demandante (récord, págs. 392 a 410) y finalmente la Sala sentenciadora dejó sin efecto la citación expedida por el Secretario y no permitió la declaración del testigo. [1]

[1] Los fundamentos que expresó la Sala sentenciadora para dejar sin efecto la citación fueron los siguientes:

"De la propia faz de la moción sobre citación y de acuerdo con los argumentos expuestos por el abogado de los demandados, aparece que esta moción es más bien una moción sobre descubrimiento de prueba que sobre producción de documentos. Si así fuera estaba gobernada por la Regla 34 y habría que demostrar que existe justa causa para obligar a los testigos citados para producir los documentos o la información que se les solicita. Independientemente de si la parte demandante en este caso es el Estado y las personas que han sido citadas son agentes del Estado y siendo una moción dirigida por una parte a otra parte en el litigio, a través de su agente, también es de aplicación la Regla 34 independientemente de que la Regla 45 expresamente no exige que se demuestre que existía justa causa para obligar a la producción de la documentación. Hemos tenido oportunidad de examinar esta tarde antes de la vista los Comentarios de Monroe (sic) sobre este particular y Monroe dice en la sección correspondiente a la Regla 45, la Sección 45.5, subdivisión 2, pág. 1722 del Vol. V que cuando se hace uso del sub-poena duces tecum por una parte hacia o de las partes en el litigio, deberá cumplirse con el cuerpo de la Regla 34 y demostrarse que existe justa causa para que se expida la citación por la Corte y no por el secretario. Aquí las dos contestaciones a la demanda se radicó una el 15 de mayo de 1951 y la otra el 26 de julio de 1951. El Tribunal entiende que los demandados han tenido más que tiempo suficiente para hacer uso de la Regla 34 y haber obtenido, de proceder, el examen de esos documentos de acuerdo con lo dispuesto en la misma regla 34 y estando envuelto aquí también la tasación hecha por un perito

El récord demuestra además que la compensación depositada por el demandante para cada parcela a razón de $3,000 la cuerda,—que fue la misma compensación que finalmente fijó el Tribunal,—se determinó a base de una valoración que el Departamento de Hacienda encomendó al Sr. Ferdinand Acevedo. Cuando hizo esta valoración al 6 de abril de 1951, fecha de la incautación, el Sr. Acevedo ocupaba el cargo de Supervisor General de Tasaciones del Departamento de Hacienda y lo ocupó hasta el 30 de junio de ese año. El Sr. Archevald era un tasador de dicho Departamento, presuntivamente bajo la supervisión del Sr. Acevedo, y compareció, según expresó en la vista el abogado del demandante, tanto en su carácter personal como en su capacidad representativa del Secretario de Hacienda. De acuerdo con el récord, no estuvo ante la consideración de la Sala sentenciadora la cuestión, como tal, de si era admisible o no en este procedimiento de expropiación evidencia sobre la tasación contributiva de la propiedad, ni la Sala expresó criterio sobre este extremo. Es en el alegato sometido a nosotros donde se menciona por primera vez que el testimonio no oído giraba en torno a una tasación para tales fines. La mayoría del Tribunal no cree necesario decidir el error levantado en lo que respecta a este incidente porque, como dije al principio, se adopta para regir en Puerto Rico la norma de absoluta exclusión de dicha evidencia.

del Gobierno, era preciso también de acuerdo con lo que sobre el particular sostiene Monroe en la misma obra citada, que se demostrara que existía justa causa para ordenarse la producción de los documentos o información que se interesaba y de acuerdo con el comentario de Monroe sobre este último aspecto que debe demostrarse a satisfacción del Tribunal que la parte que solicita la información o documentos no tendría otros medios a su alcance para obtener los hechos que interesaba obtener mediante el uso del sub-poena duces tecum a través de la Regla 34 y como no se ha demostrado al Tribunal que eso redundaría en una injusticia para la parte demandada en la presentación de su caso de no permitírsele hacer uso del sub-poena duces tecum, en esta forma, el Tribunal deja sin efecto la citación expedida por el secretario dirigida al Secretario de Hacienda y al empleado de la Secretaría de Hacienda Sr. Carlos Archevald."

La exclusión o admisión de prueba sobre la tasación contributiva ($^2$) en procedimientos de expropiación forzosa presenta variadas modalidades que deben ser tomadas en cuenta. Orgel enfoca el problema en dos formas: si la tasación contributiva de la propiedad puede usarse como el único y exclusivo criterio de la justa compensación; y, asumiendo que la justa compensación no pueda basarse totalmente en la tasación contributiva, hasta qué punto ésta es admisible en evidencia en procedimientos de expropiación. Concluye el tratadista que si bien la tasación contributiva no debe ser decisiva en cuanto a la apropiada valoración para fines de compensación en expropiación forzosa, de ello no se infiere necesariamente que la misma sea del todo impertinente al llegarse al monto de esta última. ($^3$) Nichols, al comentar sobre la exclusión de esta evidencia, observa que en muchos sitios del país la tasación contributiva sería de poca ayuda en procedimientos de expropiación forzosa ya que no en todas partes se acostumbra tasar la propiedad en su total valor de mercado, pero señala a continuación que en algunos estados, sin embargo, la tasación contributiva tiene por miras representar el valor razonable en el mercado de la propiedad, y si los tasadores son personas diestras y de entereza, usualmente se le da uso al valor de tasación al fijarse el precio de una venta voluntaria o al zanjar casos de expropiación fuera de corte, y expresa *que sería de verdadera utilidad a un jurado como punto preciso de partida en sus deliberaciones.* ($^4$)

El criterio de la mayoría de las cortes ha sido que la tasación contributiva no constituye por sí misma prueba del valor de la propiedad admisible para otros fines que no sean imponer la contribución. Por otra parte, ha sido también

---

($^2$) La referencia en esta opinión a la "tasación contributiva" ha de entenderse que es a la tasación hecha para imponer la contribución sobre la propiedad, (*assessment roll*) y no a tasaciones para otros fines contributivos o *ad hoc*.

($^3$) *"Valuation Under the Law of Eminent Domain"*, 2da. ed., Vol. 1, págs. 632–633.

($^4$) "The Law of Eminent Domain", 3ra. ed., Vol. 5, pág. 316.

el criterio de la mayoría de las cortes, salvo contadas excepciones, que la tasación contributiva constituye una expresión del valor de la propiedad cuando el valor para fines contributivos se ha fijado por el propio dueño o con su intervención, admisible en aquellos casos de otra naturaleza en donde el valor de la propiedad ha estado en controversia y el dueño ha sido parte en el litigio. Mayormente, éstos han sido casos de expropiación forzosa y acciones del dueño por daños causados a la misma. (Véase 39 A.L.R. 2d, 209, págs. 212, 214, 225). Hasta donde ha sido posible examinar la situación, hay que consignar el hecho que lo que ha venido a ser la regla generalmente aceptada de exclusión de esta prueba se ha enunciado, en la inmensa mayoría de los casos, en situaciones en que la evidencia se intentó ofrecer—para limitarnos ya a los casos de expropiación—por la parte expropiadora contra el dueño o la parte a quien se le expropia, en un intento de no compensar más del valor tributable.([5]) Indudablemente, este hecho ha tenido mucho que ver con la formulación de la regla general, en gran parte su justificación, si se considera cuál ha sido la razón de ser de la misma. El por qué mayormente se ha excluido esta evidencia ha sido el hecho comunmente reconocido por las cortes en esas jurisdicciones que de ordinario, usual y corrientemente, los tasadores como cuestión de realidad no tasan la propiedad para fines de la contribución sobre la misma en todo su valor verdadero, o en su valor de mercado, no siendo por lo tanto la tasación en tales casos evidencia pertinente o confiable de valor para otros propósitos no contributivos. Considerando los anteriores hechos en conjunto, así como los fundamentos de la ley de evidencia que de ordinario han aplicado las cortes para rechazar la prueba aludida, (39 A.L.R. 2d, 209, págs. 213, 223-229;

---

([5]) Tanto Orgel, op. cit. pág. 638, como Nichols, op. cit. pág. 314, señalan este hecho. Así también se apunta en *United States* v. *Certain Parcels of Land, etc.* (C. A. 4) 261 F.2d 287, a la pág. 291. Ha habido ocasiones en que la evidencia se ofreció por la parte a quien se le expropia y se excluyó, como en el citado caso, pero de ordinario la situación ha sido la otra.

Nichols, op. cit. pág. 315; Orgel, op. cit. págs. 634–636, *res inter alios acta*, prueba de referencia, declaraciones *ex parte*, prueba no sujeta a contrainterrogatorio), puede decirse que la regla de exclusión se formuló primordialmente en protección del dueño de la propiedad, reclamante, contra los efectos adversos para él de una prueba de valor producto de determinaciones ajenas. Se explica, en contraposición, que la evidencia se haya declarado admisible, como regla casi unánime, cuando la tasación contributiva se ha fijado por el dueño reclamante, como una expresión suya de valor que pudiera perjudicarle, o para contradecir su testimonio o su credibilidad. El examen de los casos no demuestra que esta prueba se haya excluido mayormente por otras consideraciones, o porque en todo caso de expropiación necesariamente haya de existir incompatibilidad irreconciliable entre los conceptos y elementos de valor para uno u otro fin. (⁶)

Considerando la regla mayoritaria que ha excluido esta prueba en términos de su razón de ser, la situación entre nosotros presenta, a mi entender, un cuadro distinto. En el artículo 295 del Código Político de 1902 según fue enmendado por la Ley de 10 de marzo de 1904 se dispuso ya por la Asamblea Legislativa que el tasador procedería a tasar la propiedad *"en su valor real y efectivo en el mercado"*, sin tener en cuenta una venta forzada, según su leal saber y entender. Al aprobarse en 1947 la "Ley de Catastro, Clasificación y Tasación de la Propiedad" (Ley 117 de 9 de mayo de 1947), se autorizó en su artículo 2 al Tesorero de Puerto Rico para hacer el catastro de toda propiedad inmueble y clasificar toda la propiedad inmueble y mueble tangible y "establecer nor-

---

(⁶) En cuanto a los muy pocos casos, en comparación, en que la prueba excluida se ofreció por el dueño o por la parte a quien se le expropia, por lo regular se rechazó la misma a la luz de los fines específicos para los que quiso ofrecerse. Véase, por ejemplo, la situación en *In re Northlake Ave.*, 165 Pac. 113; *Dallas v. Malloy*, 214 So.2d 154 y en *Girard Trust Co. v. City of Philadelphia*, 93 Atl. 947. Cf: *Bowie Co. v. United States*, 155 F.2d 225; *United States v. Delano Park Homes*, 146 F.2d 473, pág. 474; *United States v. Certain Parcels of Land, etc.*, supra, pág. 291.

mas de valoración y tasación con tal exactitud y detalles científicos, que permita fijar tipos adecuados y equitativos de valoración de la propiedad para fines contributivos." El artículo 3 de dicha ley según fue originalmente aprobado disponía que el Tesorero clasificaría todos los terrenos agrícolas a base del uso más provechoso y razonable a que pudieran dedicarse los mismos, debiendo el Tesorero tomar en consideración todos aquellos factores que, previa investigación y recomendación del personal técnico que nombrara para llevar a cabo los propósitos de la ley, juzgara pertinentes, incluyendo: (a)..., (b)..., (c)..., (d) "Precios en el mercado existentes para las varias clases y tipos de terrenos en sus respectivas jurisdicciones".

Al ser enmendado el artículo 3 por la Ley 228 de 5 de mayo de 1950, se dispuso que el Tesorero clasificaría y *tasaría* toda la propiedad a base del uso más provechoso y razonable a que pudiera dedicarse la misma debiendo tomar en cuenta etc., incluyendo: ...(d) "Valor en el mercado existente para las varias clases y tipos de terrenos en sus respectivas jurisdicciones". Más tarde, por la Ley 37 de 27 de marzo de 1951, el artículo 3 de la "Ley de Catastro, Clasificación y Tasación de la Propiedad" de 1947 volvió a ser enmendado para disponer que el Tesorero clasificará y tasará toda la propiedad inmueble *"en su valor real y efectivo* utilizando cualesquiera de los métodos y factores reconocidos en materia de valoración o tasación de la propiedad, de manera que las tasaciones para cada uno de los distintos tipos de propiedad resulten uniformes." Esta enmienda se aprobó con efecto retrospectivo al 1ro. de enero de 1951. En la enmienda que para la misma época se le hizo al artículo 295 por la Ley 133 de 27 de abril de 1950, se cambió un poco el lenguaje originalmente usado en 1904 al efecto de que la propiedad se tasaría *"en su valor real y efectivo en el mercado, sin tener en cuenta una venta forzada,* según su leal saber y entender", por el de que la propiedad se tasará *"en su valor real y efectivo,* considerando todos los factores en materia de valoración o tasación, *inclu-*

130

*yendo el valor en el mercado*, sin tener en cuenta una venta forzada."

Las enmiendas de 1950 y 1951 a la ley de tasación de 1947 consideradas conjuntamente con la enmienda de 1950 al artículo 295, demuestran sin lugar a dudas que el Legislador ratificó una vez más, si es que pudo entenderse suplantada, la norma en vigor desde 1904 que requiere que la propiedad se tase para imponerle contribución en el *"valor real y efectivo"* de la misma, incluyendo, entre otros factores a considerarse, su valor en el mercado. Aunque la Asamblea Legislativa dejó al buen criterio administrativo la adopción de los métodos más exactos y científicos para hacer la tasación, la valoración hecha, ya fuere el producto de una persona, o el criterio agregado de un grupo de personas actuando conjuntamente, ha de representar por mandato de ley el valor *real y efectivo* de la propiedad. Con el debido reconocimiento a su autoridad, no me parece buena entre nosotros a la luz de las normas legislativas que aquí rigen, la afirmación del tratadista Taylor al efecto de que el propósito de un sistema de tasación científica no debe ser el de determinar el valor "real" de la propiedad sino el de establecer una base razonable y equitativa para las contribuciones, ni me es posible convenir del todo en que el sistema de tasación de la propiedad inmueble no persiga (en Puerto Rico) una valoración completamente individualizada de cada propiedad para determinar con la mayor precisión posible su valor "real" en el mercado. (⁷)

Bajo nuestro sistema, la tasación de la propiedad en su *valor real y efectivo* a los fines de imponerle contribución

(⁷) Todo tiende a indicar que el criterio administrativo ha seguido cumplidamente la norma legislativa. Véanse, escolios (4) y (7) de la opinión del Tribunal—"Establecido ya para cada propiedad su valor en el mercado tanto de la tierra como de las estructuras . . .", (escolio 7). Los ajustes a ese valor que siguen tienden a evitar, según se expresa al final del propio escolio, que la propiedad sobrepase su valor en el mercado en un período de años siguientes hasta una nueva revisión.

El hecho de que la tasación sirva también para fijar constitucionalmente el margen prestatario del país fortalece más bien el criterio, por razones obvias, de que la misma ha de representar el valor real.

pudiera resultar para el dueño, en determinadas circunstancias o casos, en la fijación de un valor absoluto mayor que el valor social y relativo de mercado, pero concebiblemente en ley, no menor del valor en el mercado, uno de sus ingredientes. Se presume que los funcionarios cumplen con la ley, y aún si por determinadas circunstancias el valor de tasación cuando menos así no lo fuere, el hecho siempre sería explicable ante el juzgador.

El motivo principal que han tenido otras jurisdicciones para desechar esta prueba a mi entender no se produce aquí, ni me parece que el valor para fines contributivos fijado de la manera que dispone el artículo 295 según se enmendó por la Ley 133 de 1950 esté divorciado de manera tan absoluta del valor en el mercado de la propiedad o sea tan extraño a éste, que ello requiera como una norma general de derecho aplicable en todo caso de expropiación forzosa, que se considere inadmisible esta prueba en la determinación de valor, independientemente de cuáles sean las circunstancias de cada caso en particular, la parte expropiadora, y qué parte o con qué fin se ofreciere la evidencia. El concepto constitucional de la justa compensación tradicionalmente interpretado exige que el perjudicado reciba, —dejando a un lado elementos incidentales de compensación,—justamente el *valor* de la propiedad que se le quita, ni más ni menos. El valor razonable en el mercado, aquel concepto de valor que entre nosotros, al igual que en la mayoría de las jurisdicciones se ha adoptado como medida de la justa compensación, [el precio en efectivo en que la propiedad cambiaría de manos en ese momento en una transacción entre un vendedor y un comprador voluntarios, *Iriarte* v. *United States* (C. A. 1) 157 F.2d. 105, pág. 110], no envuelve un concepto unitario. Valor razonable en el mercado es una expresión sintética que compendia y resume todos aquellos elementos y atributos de la propiedad que fijan un *determinado precio* en una transacción voluntaria libre de presiones. El concepto de *valor real y efectivo*

no puede abstraerse de esos elementos y atributos de la propiedad, o dejaría de ser, cuando menos, valor *real*.

No sostengo, tampoco, que por las consideraciones apuntadas *a fortiori* sea admisible, como cuestión de derecho, prueba de la tasación contributiva en todo caso de expropiación y en toda circunstancia, o que la misma no sea propiamente excluible bajo preceptos aplicables de la ley de evidencia que impedirían su admisión. La determinación judicial de la justa compensación se rige por principios equitativos, Cf: *City of Fort Worth, Tex.* v. *United States*, 188 F.2d 217, 223; *Jefferson County, etc.* v. *Tennessee Valley Authority*, 146 F.2d 564, 566, *cert. denegado*, 324 U. S. 871; *Orange State Oil Co.* v. *Jacksonville, etc.*, 110 So.2d 687, 690; y la norma más aconsejable y de más utilidad quizás sea aquélla que permita al juzgador, a menos que se trate de evidencia manifiestamente inadmisible, tener ante sí todos los elementos de prueba e índices de valor que le ayuden a formar un juicio acertado de lo que debe ser el monto de la justa compensación. (8)

En lo que respecta ya al caso de autos, los demandados hicieron constar que el testigo Sr. Archevald "declararía sobre

---

(8) *Wigmore*, (3ra. ed., Vol. 5 pág. 552, sec. 1640) refiriéndose a los registros oficiales de tasación expresa en lo pertinente: "Es cierto también que en muchas comunidades el libro de tasación fija valores notoriamente muy por debajo de los patrones existentes; y que en otras el tasador acepta sin discusión la declaración archivada por el dueño; donde prevalecen estas prácticas, es cosa simple el rechazar esos libros en particular como evidencia de valor que no presta confianza, y como inadmisibles. Pero cuando los libros no dejan tan notoriamente de prestar confianza, no parece que exista una buena objeción a recibirlos. Nadie sostiene que son decisivos; pero por lo menos ellos proporcionan alguna evidencia a una mente juiciosa en busca de la verdad." Cf: *In re Site for Memorial Hall*, 25 N.W.2d 174, 176; *Louisville & N. R. Co.* v. *Burnam*, 284 S.W. 391, 395; *City of New Orleans* v. *Larroux*, 14 So.2d 812, 813; *Equitable Life Assur. Soc.* v. *Kevitt*, 54 N.Y.S.2d 643, págs. 651–652; *McCandless* v. *United States*, 74 F.2d 596, pág. 604; *Donaldson* v. *Greenwood*, 242 P.2d 1038, pág. 1046; *In re Board of Water Supply*, 130 N.Y.S. 997, págs. 999–1000; *Krider* v. *City of Philadelphia*, 36 Atl. 405; *Louisiana Highway Commission* v. *Giaccone*, 140 So. 286, pág. 290.

No me parece que la disposición adicionada al artículo 3 de la Ley 117 de 1947 por la Ley 228 de 1950 en el sentido de que las planillas, tarjetas, mapas, fotografías, planos, etc. y la demás información obtenida o usada

sus actividades en relación con las propiedades objeto de la expropiación y declararía que el valor a la fecha del 'taking' era de $2 el metro cuadrado la Parcela A y en la Parcela B el valor era de $27.150, el justo valor de la parcela." (Récord, pág. 413. Al someter el caso anunciaron que el valor de los terrenos era de $2 el metro). Asumiendo que de haber declarado el testigo el récord demostraría que éste era el valor de tasación para fines de la contribución sobre la propiedad, lo cual querría decir que representaba en ley el valor *real y efectivo* de la misma, en las circunstancias de este caso la evidencia pudo haber sido admisible, si no como conclusiva para fijar la compensación, tal como dicen las autoridades, cuando menos como un índice de valor *real* fijado por una de las propias partes litigantes, a ser tenido en cuenta juntamente con la demás prueba. Si en una valoración contemporánea con la efectuada para los fines de esta expropiación el gobierno había fijado a la propiedad un valor real y efectivo de $2 para imponerle contribución, en una mente juiciosa de juzgador en busca de la verdad, como dice Wigmore, la prueba podría ser pertinente en cuanto al peso y grado de corrección que le mereciera la declaración de un perito del propio gobierno fijándole a la propiedad para la misma época un valor de sólo $0.75 el metro cuadrado a los fines de la justa compensación, en ausencia de una explicación racional. Más aún si, como señala el récord, la tasación para fines contributivos pudo haberse hecho bajo la supervisión general de ese perito.

El distinguido Juez sentenciador aplicó unas normas demasiado rigurosas desde el punto de vista procesal al no permitir que el testigo prestara declaración, y a mi entender fue errónea su determinación a tal efecto. Al devolverse este caso para ulteriores consideraciones yo instruiría al Juez que permita al testigo declarar si se ofreciere por los demandados.

por el Tesorero en la tasación científica constituyen prueba *prima facie*, para fines contributivos, de las circunstancias y del valor de tasación y como tal (prueba *prima facie*) deberán ser admitidos en evidencia, tenga el efecto de declarar prueba inadmisible el valor de tasación en otros casos.