# 2006 DTA 114

## TRIBUNAL DE APELACIONES
## REGIÓN JUDICIAL DE PONCE

ESTADO LIBRE ASOCIADO DE PUERTO RICO, *ET AL.*
Demandantes-Peticionarios

v.

SUCESIÓN MARIO L. MERCADO RIERA, *ET AL.*
Demandados-Recurridos

Núm. KLCE-05-00044

San Juan, Puerto Rico, a 11 de septiembre de 2006

Panel integrado por su Presidente, el Juez Gierbolini,
la Juez Cotto Vives y el Juez Aponte Jiménez

Aponte Jiménez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El Estado Libre Asociado de Puerto Rico (en adelante "*el E.L.A.*") nos solicita que revoquemos la resolución emitida el 4 de noviembre de 2004 por el Tribunal de Primera Instancia, Sala Superior de Ponce ("*TPI*"), mediante la cual dicho foro estableció en $15,000 el valor unitario de 90.03 cuerdas de terreno expropiadas a la corporación H.P.Y., Inc. (en adelante "*H.P.Y.*"), situadas en el Barrio Canas del término municipal de Ponce. Imputa la comisión del siguiente error:

Cometió error el Honorable Tribunal de Instancia al realizar un ajuste **neto positivo** de 25% al precio de $12,000.00 de la comparable seleccionada, cuando la propiedad sujeto era inferior a la comparable en cuatro (4) factores. El tribunal realizó ajustes positivos por inundabilidad y vista que no se sostienen en la prueba desfilada. La cifra de $15,000.00 por cuerda resulta arbitraria por ser inconsistente con las determinaciones que plasmó el propio tribunal de instancia en la resolución recurrida.

En síntesis, la controversia ante nuestra consideración requiere que determinemos si los ajustes realizados por el TPI a los fines de fijar el precio unitario del sujeto por razón del factor de inundabilidad en la venta comparable seleccionada para establecer el valor se sostienen con la prueba pericial y documental presentada en el juicio. También si el de vista al mar del sujeto permite otro ajuste positivo a su precio unitario.

Por los fundamentos que exponemos a continuación, modificamos la resolución recurrida.

El récord refleja que los hechos esenciales no están en controversia. El presente recurso es secuela de la sentencia emitida por este Tribunal el 27 de agosto de 1999 en el recurso KLCE-98-01051, entre las mismas partes. En esa ocasión determinamos que la compensación de los terrenos debía retrotraerse al 3 de noviembre de 1988 cuando el E.L.A. adquirió título sobre la primera porción de las tierras. Así, todos los terrenos expropiados serían evaluados según los mismos parámetros, corrigiéndose la tardanza en compensar por los que quedaron excluidos del primer proceso mediante la concesión de intereses a partir de la fecha de la expropiación. Apéndice del recurso, págs. 5-6. Todos estos aspectos fueron adjudicados de forma final por este Tribunal y constituyen la ley del caso. Apéndice del recurso, pág. 7.

Devuelto el asunto al TPI, éste ordenó a las partes que prepararan informes de valoración utilizando el método de ventas comparables para calcular el ajuste retroactivo al 1988. En cumplimiento, el E.L.A. presentó uno preparado por el perito tasador Ing. Isidro M. Martínez Gilormini. Las comparables que éste aplicó consisten de cinco propiedades situadas en el área que, a su juicio, eran pertinentes para establecer el valor en el mercado del sujeto el cual fijó en $8,500 el unitario. (Véase, transcripción de la vista del 6 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, págs. 122-123. Además, el Addendum al Informe de Tasación, pág. 7).

H.P.Y. presentó el suyo. Lo preparó el perito tasador Félix J. Rodríguez Arroyo. Las comparables que utilizó consisten de tres propiedades. Determinó que el valor de la propiedad sujeto era de $2,825,000 con un valor unitario de $31,368.33 por cuerda. Apéndice del recurso, pág. 15.

Se celebraron vistas para evaluar la prueba pericial y documental presentada por las partes. El TPI tomó conocimiento judicial de la sentencia en el caso KEF88-0418 sobre la expropiación de 199.0843 cuerdas aledañas al terreno que nos ocupa, para el cual se pagó a razón de $4,000 la cuerda por estipulación Apéndice del recurso, pág. 8 y de la sentencia KLAN-96-00681, en el caso JAC95-0190. Véase, transcripción de la vista del 6 de octubre de 2003, testimonio del perito tasador Félix Rodríguez Arroyo, pág. 63. Realizó también una inspección ocular de la propiedad sujeto y de las ventas comparables utilizadas por las partes en sus informes. Apéndice del recurso, pág. 20.

Examinados los testimonios ofrecidos y la prueba documental presentada, el 4 de noviembre de 2004, el TPI

emitió la resolución recurrida. Resolvió que la propiedad sujeto colinda al noreste, *"a una distancia de aproximadamente un (1) km con el Vertedero Municipal de Ponce, el cual para la fecha efectiva de la tasación ya existía"* y que al 3 de noviembre de 1988, *"era una finca vacante con una topografía accidentada o escarpada y con por lo menos dos depresiones bien marcadas, con un uso potencialmente residencial."* Apéndice del recurso, págs. 14-16.

Sobre el informe del perito Isidro Martínez Gilormini determinó que las ventas comparables 2 y 3 que utilizó eran las más que se ajustaban a la realidad económica de la propiedad sujeto. Apéndice del recurso, pág. 20. Añadió que estaban más próximas, ubicaban dentro de un vecindario similar, eran producto de compraventas entre partes extrañas, sin trabas por razón de expropiación, venta judicial o cualquier otra limitación, y se trataba de compraventas coetáneas a la fecha de la incautación del sujeto. Apéndice del recurso, pág. 21. Observó que la comparable Núm. 3, tenía menor cabida que la propiedad sujeto, mejor topografía por ser totalmente llana, mejor acceso a la carretera Núm. 2 y una clasificación de uso comercial. No obstante, expuso que más de un 50% de su área era inundable y para atemperarla a su uso era necesario rellenarla. Apéndice del recurso, págs. 17 y 21. También resaltó que no tenía vista hacia el mar, contrario a la propiedad sujeto que tiene *"una vista imponente hacia el Mar Caribe."* Apéndice del recurso, págs. 17 y 21. Agregó que el precio unitario ajustado según el Addendum al Informe de Tasación del perito Isidro Martínez Gilormini de la comparable Núm. 3 era $12,070. Apéndice del recurso, págs. 21 y 84.

Finalmente, escogió la comparable Núm. 3 como la más apropiada porque le pareció que era la que mejor representaba a la propiedad sujeto. Expresó lo siguiente, según surge del apéndice del recurso, pág. 21:

*"Por su proximidad de la Comparable Núm. 3 al sujeto y estar afectadas ambas fincas por el Vertedero Municipal, el Tribunal concluye que esta comparable es la que mejor representa al sujeto. Pero ésta adolece de dos ajustes sumamente relevantes: el primero por estar en zona inundable, y el segundo por carecer de la vista panorámica que tiene la propiedad sujeto."*

El Tribunal considera que el precio unitario de $12,000.00 de la Comparable Núm. 3 debe sufrir un ajuste neto y positivo de un 25% cubriendo ajustes positivos y negativos por consideraciones de vista, inundabilidad, topografía, cabida, accesos, de mejor uso y más provechoso uso. Así pues, se incrementa el precio unitario por cuerda de la Comparable Núm. 3 de $12,000.00 a $15,000.00 ($12,000.00 × 1.25%).

Aunque admitió en evidencia el informe del perito de H.P.Y., Félix Rodríguez Arroyo, lo descartó. Observó que sus ventas comparables ubicaban *"en el extremo opuesto de la Ciudad de Ponce"* y *"que la superioridad de estas comparables con el sujeto, las hacen incomparables con el mismo."* Apéndice del recurso, págs. 15 y 16.

Concluyó que el valor de las 90.03 cuerdas de terreno pertenecientes a H.P.Y. era de $1,350,045, con un precio unitario de $15,000 por cuerda. Ordenó al E.L.A. consignar a favor de H.P.Y. la cantidad restante, considerando la ya hecha de $1,000,000. Apéndice del recurso, págs. 21-22.

Oportunamente, el E.L.A. solicitó reconsideración. El TPI la denegó. Expresó que *"que el valor asignado contempla el elemento de uso potencial del terreno a tono con su localización y vista hacia el Mar Caribe, el cual rebasa marcadamente los ajustes negativos que el tasador del E.L.A. le dio al sujeto en comparación con la Comparable Núm. 3."* Apéndice del recurso, pág. 36.

Inconforme, recurre ante nos el E.L.A. Alega, que el ajuste positivo al valor unitario de la comparable Núm. 3, por los factores de inundabilidad y vista al mar no se sostienen en la prueba. Agrega que el valor unitario de $15,000 por cuerda fijado por el TPI no se ajusta a la prueba admitida ni a las determinaciones de hechos.

H.P.Y. se opone. Alega, en síntesis, que la comparable Núm. 3 ubica en zona inundable. Alegato, pág. 13.

Examinados los autos originales del caso observamos que el *"Alegato de H.P.Y., Inc."*, ante este Foro reproduce lo expuesto en su *"MEMORANDO DE DERECHO"* presentado el 15 de marzo de 2004, ante el TPI. (Tomo XVII), cuando se le solicitó a las partes que los sometieran y argumentaran la posición de los peritos y las comparables. Véase, transcripción de la vista del 7 de octubre de 2003, pág. 45.

El Art. II, Sección 9 de la Constitución del Estado Libre Asociado establece que *"[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley."*

El derecho de expropiación del Estado es un atributo inherente y necesario de la soberanía y es superior a todos los derechos de propiedad. *López y otros v. A.E.E.,* 151 D.P.R. 701, 706 (2000); *Adm. de Terrenos v. Nerashford Dev. Corp.,* 136 D.P.R. 801, 808 (1994); *E.L.A. v. Registrador,* 111 D.P.R. 117 (1981). Sin embargo, este poder del Estado está limitado por la exigencia del pago de una justa compensación, que el objeto expropiado sea para un fin público y que se siga el procedimiento establecido por ley. *Culebra Enterprises Corp. v. E.L.A.,* 143 D.P.R. 935, 946 (1997); *Hampton Development Corp. v. E.L.A.,* 139 D.P.R. 877 (1996); *E.L.A. v. Registrador, supra,* pág. 119; *E.L.A. v. Rosso,* 95 D.P.R. 501, 536 (1967).

La justa compensación a que tiene derecho el dueño de un predio expropiado es aquella cantidad que representa todo el valor de la propiedad al tiempo de la incautación. *Olivero v. Autoridad de Carreteras,* 107 D.P.R. 301, 314 (1978); *E.L.A. v. Fonalledas Córdova,* 84 D.P.R. 573, 579 (1962).

Aunque el Estado es el que inicia el procedimiento de expropiación forzosa, el peso de la prueba respecto a si el justo valor del bien expropiado es mayor que la suma de dinero consignada en el tribunal recae sobre la parte que reclama dicho aumento en valor. *Martínez Rivera v. Tribunal Superior,* 85 D.P.R. 1, 11 (1962); *Pueblo v. García,* 66 D.P.R. 504, 508 (1946). Véase, además, *E.L.A. v. Fonalledas Córdova, supra,* pág. 574; *Estado Libre v. Bravo,* 79 D.P.R. 779, 785 (1956).

Cuando se cuestione la cuantía de la compensación a pagar por el Estado, el dueño, aunque nominalmente aparezca como demandado, ocupa en realidad la posición de demandante. Como tal, debe probar su derecho a recobrar una cantidad mayor que la consignada como valor de la propiedad. *A.C.T. P.R. v. 78061m2, BPPR,* **2005 J.T.S. 97**, pág. 1,443; *Pueblo v. García, supra,* pág. 508. Es a quien le incumbe entonces cuestionar la cantidad depositada como justa compensación y presentar la evidencia correspondiente sobre el valor en el mercado del inmueble expropiado. *A.C.T.P.R. v. 78061m2,BPPR, supra,* págs. 1,442-1,443, 2005JTS 97; *Martínez Rivera v. Tribunal Superior, supra,* pág. 11.

Como medida para el pago de la justa compensación, se adoptó el concepto de valor en el mercado de la propiedad, según establecido en la jurisdicción federal. *Adm. de Terrenos v. Nerashford Dev. Corp., supra,* pág. 807. Ha sido definido como el precio que un comprador determinado en una venta no forzada estaría dispuesto a pagar y aquél en que un vendedor, en las mismas circunstancias, estaría dispuesto a vender, consideradas las condiciones en que se encuentre el terreno en la fecha de la expropiación y el uso más productivo al que el dueño pudiere dedicarlo dentro de un futuro razonablemente cercano. *Adm. de Terrenos v. Nerashford Dev. Corp., supra,* pág. 809; *Pueblo v. Huyke,* 70 D.P.R. 754, 756-757 (1950).

Para determinarlo, el tribunal debe tomar en consideración todo elemento o indicador que un comprador prudente consideraría. *Adm. de Terrenos v. Nerashford Dev. Corp., supra,* pág. 809. Sobre este tema se ha expresado:

*"In determining fair market value of property in condemnation proceedings, the triers of fact are generally allowed to consider those elements that "fairly might be brought forward and reasonably be given substantial weight (in) fair negotiations by an owner willing to sell and a purchaser desiring to buy". **Therefore, the relevant***

*factors in condemnation case, where the major issue is the fair market value of the condemned property, are those that a hypothetical buyer and seller would consider in setting a purchase price for the property."*

Véase, 5 *Nichols on Eminent Domain*, Mathew Bender, §18.05[1], p. 18-25, tercera edición, énfasis suplido.

Las ventas de propiedades similares constituyen la prueba principal del valor en el mercado que ayuda en la determinación de un valor justo. *E.L.A. v. Fonalledas Córdova, supra,* pág. 580, citando a *Pueblo v. Amadeo,* 82 D.P.R. 102, 122 (1961). El valor razonable en el mercado de una parcela de terreno expropiada no puede fijarse descansándose para ello en bases inciertas y puramente especulativas. *E.L.A. v. Fonalledas Córdova, supra,* pág. 579, citando a *ELA v. Sucn. Gautier,* 81 D.P.R. 580, 594 (1959). De ahí que es pertinente considerar la similitud en topografía, facilidades, servicios, acceso, ubicación, cabida y el mejor uso de lo expropiado y los bienes comparables. *Pueblo v. Amadeo, supra,* pág. 122; *Estado Libre v. Bravo, supra,* pág. 785. Si las compraventas no reúnen estos requisitos, las mismas no serán admisibles.

Una vez se establece la justa compensación por el testimonio pericial admisible, se podrá pasar al informe de valoración que se rinde. Es en éste que se puede apreciar la investigación que realizó y el análisis de los datos obtenidos. Toda esta información y evaluación es lo que sustenta su estimado de valor.

Se ha establecido que la opinión pericial es sólo una conjetura de personas informadas. *E.L.A. v. Fonalledas Córdova, supra,* citando a *Autoridad Sobre Hogares de P.R. v. Valldejuli,* 71 D.P.R. 640, 643 (1950). Por lo tanto, la función judicial de determinar una justa compensación por la propiedad expropiada no está limitada por el criterio de unos u otros peritos. *Autoridad Sobre Hogares v. Viera,* 72 D.P.R. 732, 736 (1951). Aunque los tribunales en estos casos pueden considerar prueba pericial que le ayude a formar criterio sobre el valor en el mercado, no tiene que seguir irremediablemente la opinión de los peritos de las partes. *E.L.A. v. Fonalledas Córdova, supra,* pág. 580.

Esto significa que no están obligados a llegar al mismo estimado de valor de algún perito en particular. Dentro de su amplia facultad podrán, con la misma prueba, usar su juicio y llegar a una conclusión distinta a cada uno de ellos. **Lo importante es que se llegue al justo valor considerando aquel testimonio que a su juicio le merezca crédito y esté basado en factores propios en la valoración que deba darse a la propiedad así como cualquier otra prueba apropiada bajo las reglas sancionadas para ello. Lo esencial y relevante es que en los autos haya prueba suficiente para sostenerla.** *Autoridad de Hogares v. Colón,* 73 D.P.R. 215 (1952).

En relación con la revisión judicial sobre la justa compensación, existe la norma de que, como foro apelativo, no estamos obligados a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo, sobre todo cuando está en conflicto con testimonios de otros peritos. En ese sentido, al evaluar prueba pericial, y documental, estamos en las mismas condiciones que el foro de instancia. *Culebra Enterprises Corp. v. E.L.A., supra,* pág. 952; *De los Ríos v. Meléndez,* 141 D.P.R. 282, 304 (1996); *Díaz v. E.L.A,* 118 D.P.R. 395, 403 (1987); *Concepción Guzmán v. A.F.F.,* 92 D.P.R. 488, 495 (1965).

Los tribunales revisores tienen amplia discreción en la apreciación de la prueba pericial pudiendo adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta. *Mun. de Loíza v. Sucns. Suárez et al.,* 154 D.P.R. 335, 363 (2001); *Dye-Tex P.R., Inc., v. Royal Ins. Co., P.R.,* 150 D.P.R. 658, 662-663 (2000); *Culebra Enterprises Corp. v. E.L.A., supra,* pág. 952.

Se ha reconocido, además, que si bien la prueba pericial podría ser de útil ayuda al formar criterio sobre el valor en el mercado, existe preferencia por las ventas similares sobre la opinión pericial. *E.L.A. v. Fonalledas Córdova, supra,* *"Only where the lower court's error is clearly prejudicial **or there is not a clear preponderance of evidence against the correctness of the judgment will there be a reversal on appeal."*** 6A *Nichols on Eminent Domain, ob cit.* §26E.03[3][d], p. 26E-125-126, énfasis suplido.

Con ese marco conceptual y evaluados los argumentos de las partes, aplicamos a los hechos que surgen de los autos y el derecho explicado.

El TPI determinó que un 50% de la comparable Núm. 3 era inundable y que era necesario rellenarla para atemperarla a su uso. El E.L.A. cuestiona esa determinación. Sostiene que su perito, Isidro Martínez Gilormini, afirmó que la comparable Núm. 3 no era inundable. Alega, además, que el perito de H.P.Y. no ofreció testimonio para contradecirlo. Véase, recurso de *certiorari*, págs. 12-13. Particularmente, aduce que su perito destacó que: (1) Esa comparable dejó de colindar con el Río Marueño, el cual causaba inundaciones, desde que se canalizó en el 1967; (2) los mapas de inundación la ubicaban fuera de los límites de zona inundable; y (3) no tenía relleno para corregir su inundabilidad, sino un corte de terreno escalonado para crear un área plana que le permitiera ser utilizada.

Arguye, además, que al realizar el ajuste positivo de 25% al precio unitario, considerando su inundabilidad, el TPI no consideró que la topografía de la propiedad sujeto significaba para ésta las mismas desventajas para el potencial de desarrollo y mejor uso. A esos efectos expresa:

*"Elevar la comparable y al sujeto a su mejor y más provechoso uso conlleva un costo sustancial, debido a la necesidad de remediar la condición de inundabilidad de la primera, y debido a la necesidad de remediar las irregularidades significativas en la topografía de la segunda. Por consiguiente, aun aceptando ... que el factor inundabilidad de la comparable número 3 es tan significativo como lo estimó el Tribunal de Instancia, procede considerar que cualquier limitación en desarrollo para el mejor y más provechoso uso de la comparable número 3 se vería contrarrestado con la limitación al desarrollo que le impone al sujeto su topografía escarpada. Así lo consideró el perito del Estado al realizar la comparación entre la comparable 3 y el sujeto en cuanto al aspecto de desarrollo a tenor con su mejor uso."*

Por su parte, H.P.Y. alega que la comparable Núm. 3 colinda por el Este con el Río Marueño. Sostiene en su alegato que *"el Exhibit XX al folio 81 y 81 vuelto establece claramente que la escritura de compraventa [de la Comparable Núm. 3] hace una nueva descripción especialmente en cuanto a sus colindancias que han sido establecidas y marcadas, en particular la colindancia Este la cual es con el río Marueño (también conocido como Río Pastillo)."*

Es preciso señalar que la prueba documental aludida no surge del expediente ni de los autos originales. Aún así, solicitamos al TPI el Exhibit XIV (Mapa de inundación de FEMA del 2 de junio de 1999 vigente al presente donde ubican las comparables 1, 2 y 3 del ELA); Exhibit XV – (Mapa de inundación de la Junta de Planificación vigente a 1988, donde ubican las comparables 1, 2 y 3 del ELA); y el Exhibit XVI (Mapa de inundaciones de FEMA del 2 de julio de 1981, vigente al 1988 donde ubican las ventas comparables 1, 2 y 3 del ELA). Solicitamos, además, el Exhibit XX – que corresponde a la Certificación Registral de la finca número 5,860 relacionada a la comparable número 3 del E.L.A.

Sobre el último exhibit (XX), según el testimonio del perito Isidro Martínez Gilormini, la colindancia este de la comparable Núm. 3 **cambió** debido a la canalización del Río Marueños. Antes de la canalización, la propiedad colindaba con el río, pero después ésta pasó a colindar con *"terrenos propiedad de la comunidad de bienes constituida por Humberto Zayas Chardón y la Sucesión de Alma Yordán Colón de Asur."* Véase, transcripción de la vista del 29 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 118.

En el contrainterrogatorio, H.P.Y. le requirió al perito que leyera las colindancias de la comparable Núm. 3. Transcripción de la Vista del 29 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, págs. 110-120. Ocurrió lo siguiente:

"*Perito:*

*Por el este con el Río Ma[ru]eño, se divide terreno ... que divide terrenos de la Sucesión de Lino eh ... Hacienda Matilde, antes, hoy de ...*

*...*

*Lcdo. Ramírez Ramos:*

*¿Coincide eso con su colindancia en su tasación?*

*Perito:*

*No señor. Porque ese Río Marueño ya fue canalizado, o sea canalizado por ... fue este ... localizado. (No se entiende del todo, muy bajito)*

*...*

*Lcdo. Ramírez Ramos:*

*¿A qué año fue esa transacción?*

*Perito:*

*Esta transacción fue al agosto de 88.*

*Lcdo. Ramírez Ramos:*

*... Por lo tanto agosto del 88, esas eran los lindes de esa propiedad.*

*...*

*Según la Certificación registral ...*

*Perito:*

*La certificación registral lo estoy leyendo.*

*...*

*Y dice aquí mis colindancias son según el plano de mensura este ... la segregación de esa finca.*

*Lcdo. Ramírez Ramos:*

*Le pregunto, ¿ese plano, qué año fue, si usted sabe?*

*Perito:*

*No me recuerdo.*

*Lcdo. Ramírez Ramos:*

*Pero de ... el registro.*

*Perito:*

*Fue para la venta.*

*Lcdo. Ramírez Ramos:*

*Le pregunto: Pero del Registro se desprende claramente que a 1988, fecha de esa transacción, la colindancia este es el Río Ma[r]ueño, ¿cierto o falso? ¿Qué se desprende del Registro?*

*Perito:*

*El Registro dice eso, está equivocado.*

*...*

*Lcdo. Ramírez Ramos:*

*Y usted está correcto.*

*Perito:*

*Es correcto. Se usan dos planos de mensura ... diferentes para ...*

*Lcdo. Ramírez Ramos:*

*Testigo, no argumente. No le pregunté. Si usted va a corregir el Registro, fantástico. ...*

*...".*

El E.L.A objetó e insistió que el perito leyera la descripción completa. H.P.Y. cuestionó al perito. Sobre ese extremo reproducimos esa parte de su testimonio:

*"Lcdo. Ramírez Ramos:*

*¿Testigo, porqué usted no incluyó esa información en su tasación?...*

*Perito:*

*La descripción mía aquí está clara.*

*Lcdo. Ramírez Ramos:*

*Está clara. Si, lo que pasa es que no me cuadra con la del Registro y como el Registro me dice que hay una nueva des ... que esta descripción es nueva tomando el documento por no estar conforme a la descripción anterior.*

*Perito:*

*Yo le digo a usted que yo obtengo, que mi mano estuvo la mensura del ingeniero Eduardo José, Juan Eduardo Torres Labó. Es donde esta finca surge de un remanente, que por cierto, es parte de un caso que está aquí ante el Honorable Juez que es del rema ... del remanente de la finca del Dr. Zayas Chardón. El Municipio de Ponce y la Sociedad de Chardón. Eso aparece ...*

*Lcdo. Ramírez Ramos:*

*O sea que entonces podemos llegar a la conclusión, según su investigación que el notario que describió esta propiedad verdad, y el Registro cometió un error.*

*...*

*¿En cuanto a la colindancia este?"*

Más adelante, el E.L.A. señaló que el río había sido canalizado en 1969 para proceder con la construcción de la Urbanización Jardines del Caribe. Véase, transcripción de la vista del 7 de octubre de 2003, pág. 78. Sostuvo, además, que *"la certificación registral no está sujeta a interpretaciones, ... [h]abla de la canalización de un río y eso lo podemos constatar objetivamente porque para eso fue que se canalizó, para construir esa urbanización."* El tribunal señaló que podía ser un desvío por la acción natural. Véase, Transcripción de la vista del 7 de octubre de 2003, pág. 79.

El testimonio del perito del E.L.A. revela que en reiteradas ocasiones expresó que la comparable Núm. 3 **no** era inundable. Véase, transcripción de la vista del 6 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 68. La certificación registral correspondiente refleja un ajuste sobre su colindancia que modifica el factor de inundación:

*"...; por el Este con el Río Marueño que divide terrenos de la Sucesión de Lino Toro y de la Hacienda Matilde antes, **hoy, por haberse desviado el cauce del río aguas arriba con terrenos propiedad de la Comunidad de Bienes constituida por Humberto Zayas Chardón y la Sucesión de Alma Yordán López de Azúa;** ... Se hace esta nueva descripción tomado del documento por no estar del todo conforme con lo que resulta del Registro."*

Véase, Exhibit XX, prueba documental de H.P.Y., al Folio 81 y 81vto. Énfasis suplido.

Finalmente, H.P.Y. preguntó a su perito, porqué descartaría la comparable Núm. 3 del E.L.A. Éste respondió que:

*"El mejor y más provechoso uso para empezar y el hecho de que al colindar con el río tiene una parte inundable la cual yo no puedo determinar y no puedo darle ajuste, no sé cuál es el ajuste que llevaría ni la cantidad del ajuste. Definitivamente tiene que ajustarse porque hay que sacar esa parte de zona inundable y ponerla en zona utilizable, que no sea inundable. ...".*

Transcripción de la vista del 7 de octubre de 2003, testimonio del perito tasador Félix Rodríguez Arroyo, pág. 83.

En otro intento para ubicar a la comparable Núm. 3 en zona inundable, H.P.Y. solicitó al perito del Estado que ubicara en los mapas de inundación de FEMA y la Junta de Planificación las comparables de su informe. Sin embargo, durante ese proceso éste manifestó, en múltiples ocasiones, que había diferencia en los mapas

provistos, por lo cual no produciría un resultado preciso.

Por ejemplo, declaró que para ubicar la comparable Núm 1 "*se requería pegarle otro mapa a la parte de arriba*". Véase, transcripción de la vista del 27 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini pág. 146. Más adelante, H.P.Y. le proveyó de un mapa de zonificación. Indicó que ese era el plano siguiente y que no estaba a la misma escala, por lo que no podía marcar la comparable Núm. 1. Véase, transcripción de la vista del 27 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 156. También expresó, "*solamente voy a marcar el mapa de abajo, que el mapa de arriba no coincide con el mapa de abajo, porque eso está en escala.*" Véase, transcripción de la vista del 27 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 166. Finalmente, marcó sólo una porción de terreno de la comparable Núm. 1.

Asimismo, H.P.Y. solicitó al perito del E.L.A. que ubicara la comparable Núm. 3 en los mapas de FEMA. Éste respondió:

"*Yo le repito, necesito el mapa de catastro. Ese es importante. Necesito el mapa de catastro que tenga la finca esa, y está si el está reducido como lo describen ustedes, está ahí en tamaño, una escala de 1 en 10,000 se ubicaría, pero no está en este mapa tampoco de ...*".

H.P.Y. le solicitó nuevamente que ubicara la comparable Núm. 3 en el mapa de inundación. Transcripción de la vista del 1 de julio de 2003, testimonio del perito tasador Isidro Martínez Gilormini, págs. 20-23. Reproducimos ese segmento:

"*Perito:*

*(no se entiende, muy bajito) Está aquí donde la finca matriz colinda con el río, y ella colinda con el remanente (no se entiende, muy bajito)*

*Lic. José Félix Ramírez:*

*¿Usted se reafirma entonces que le dimos del Registro estaba equivocada entonces? ¿Dónde colinda con el río?*

*Perito:*

*(no se entiende) Dónde está ... está Heavy Equipment este ... si colinda con el río, si colinda con el río ... (no se entiende) por allí es propiedad de ... es propiedad de ...*

*Lic. José Félix Ramírez:*

*O sea que usted no descartaría que podría estar colindando con el río.*

*Perito:*

*No, señor, estoy seguro que no colinda con el río por lo menos, en su cauce. Yo ... (no se entiende)*

*Lic. José Félix Ramírez:*

*O sea que usted se reitera que la descripción que hace el Registro de la Propiedad que leímos la vez pasada donde establece claramente que colinda con el río está equivocada.*

...

*Volveremos a eso en su momento. Testigo nos gustaría que la marcara, con los puntitos azules.*

*Perito:*

*Estos terrenos estamos hablando es al norte de la carretera 500, (no se entiende). Es el remanente de la finca, el remanente de la ...*

*Tribunal:*

*¿Cómo se llama el Río?*
...

*Perito:*

*... no sé como lo llaman aquí porque tiene ese nombre. Este ... en este punto en específico, le llaman el Río Pastillo.*

...

*Es el mismo que más abajo ...*

*Tribunal:*

*¿Pero queda al sur? ¿El Río Pastillo?*

*Perito:*

*El este*

...

*Pero más abajo ese es el mismo río ... que se llama así."*

Aunque identificó en el mapa la comparable Núm. 3, afirmó que era una ubicación aproximada. Véase, Transcripción de la vista del 1 de julio de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 29. Más adelante, declaró que para contestar a las preguntas *"tendría que mostrarle gráficamente, con precisión, para hacérselo con precisión en una mesa de dibujo."* Transcripción de la vista del 1 de julio de 2003, testimonio del perito tasador Isidro Martínez Gilormini, a la pág. 34.

Sostuvo, además, que:

*"... la venta comparable es parte de la finca original del Zayas Chardón. Dice a Zayas Chardón para quizás sea mejor ubicación que es la que está en el pleito ese ... Chardón v. Municipio de Ponce, de expropiación inversa que le trae esto. Esa finca sí colinda con el sitio. Pero ese remanente de la finca no es la venta comparable. Es el remanente de la finca que no es la venta comparable. Si ellos están tan ... ellos quieren darle la ubicación de la finca, del remanente de la finca matriz como si fuese la venta comparable y no es correcto.*

*Tribunal:*

*La venta comparable fue una porción que se segregó.*

*Perito:*

*La venta comparable es una porción al oeste ...*

*Tribunal:*

*¿Segregada de esa finca?*

*Perito:*

*Segregada de esa finca, si señor. Por consiguiente hay una porción sustancialmente grande de 10, 9 punto setenta y pico de cuerdas que está al Este de esa venta y que colinda con el Río que colinda con la venta comparable ...*

*Tribunal:*

*Pero la comparable suya no es ...*

*Perito:*

*No es ... esa es*

*Tribunal:*

*No es inundable*

*Lic. José Félix Ramírez:*

*Su Señoría, yo me remito al Récord y a la certificación registral cuando se establece esa venta el 30 de mayo de 1985 donde dice claramente que se hace una nueva descripción para los efectos de reflejar el estado real de esa finca a 1985 y claramente establece que colindaba con el río. Nos remitimos al Récord y a la certificación registral que ya presentamos como Exhibit.*

*Tribunal:*

*Bien. Cerramos este estudio de terminación judicial. "*

Transcripción de la vista del 1 de julio de 2003, testimonio del perito tasador Isidro Martínez Gilormini, a las págs. 36-37.

Finalmente, H.P.Y. solicitó al perito que iniciara en los mapas las marcas que realizó y que ubicara la comparable Núm. 3. Transcripción de la vista del 2 de julio de 2003, testimonio del perito tasador Isidro Martínez Gilormini, págs. 22-24. Surge lo siguiente:

*"Perito:*

*Nuevamente, este mapa no coincide con ...*

*Lic. José Félix Ramírez:*

*¿O sea que no podría marcarla a precisión?*

*Perito:*

*Yo no, porque ... estaba marcada la finca.*

*Lic. José Félix Ramírez:*

*... completa.*

*Perito:*

*La finca ...*

*Lic. José Félix Ramírez:*

*Si no es a precisión, pues vamos a obviar entonces ese ejercicio.*

*Perito:*

*Pero, déjeme marcarle las parcelas porque ... a mano derecha, al este ... ahí, en cuanto al este ... hay 9.97 cuerdas ... la finca principal colinda ... con el Río Matilde.*

*Lic. José Félix Ramírez:*

*O sea lo que usted está reafirmándose es que en la descripción que leímos del Registro que aparece en la Escritura de Compraventa la cual utilizó que dio título a esa Compraventa está erróneo.*

*Perito:*

*No los ... (no se entiende)*

*Lic. José Félix Ramírez:*

*Márquela.*

*Perito:*

*La parcela número ... (no se entiende, (muy lejos).*
*...*

*No ven ... este ...*

*Lic. José Félix Ramírez:*

*No puede marcarlo. Seguimos con la comparable número 4 ...".*

Comparamos, ahora, el testimonio del perito de H.P.Y. sobre la comparable Núm. 3 con el del perito del E. L.A. que utilizó el TPI. Transcripción de la vista del 7 de octubre de 2003, perito tasador Félix Rodríguez Arroyo, págs. 68-77.

*"Lcdo. José Félix Ramírez:*

*Testigo, Perito, ¿conoce usted la comparable número Tres del Estado?*

*Perito:*

*Sí, eso es correcto.*

*Lcdo. José Félix Ramírez:*

*¿Visitó usted dicha propiedad?*

*Perito:*

*Sí. La visité.*

*Lcdo. José Félix Ramírez:*

*En su opinión, ¿qué defecto, si alguno, tiene dicha comparable?*

*Perito:*

*... Este, al visitarla la parte que yo vi allí lo que vi que colinda con el río, parte. También colinda, como aquí bien lo dice, con terrenos de la Puerto Rico Cement Company que es una operación industrial.*
*...*

*Lcdo. José Félix Ramírez:*

*¿Usted examinó la descripción registral de dicha propiedad?*

*Perito:*

*La examiné.*
*...*

*Lcdo. José Félix Ramírez:*

*..., le pregunto, ¿si en algunas de sus colindancias establece que está al lado de un río?*

*Perito:*

*Por el Este con el río Marueños ...*
*...*

*Lcdo. José Félix Ramírez:*

..., le pregunto, ¿si eso es cónsono con lo que es usted pudo ver físicamente cuando visitó el lugar, con la comparable?

*Perito:*

Cuando la vi tenía parte contraria a donde está hoy la calle que pasa por al frente, se ve que pasa el río.

*Lcdo. José Félix Ramírez:*

¿Qué categoría, si alguna, le dio el señor Martínez Gilormini, el Perito, en su tasación en cuanto a la inundabilidad?

*Perito:*

No inundable:

*Lcdo. José Félix Ramírez:*

Según el estudio que usted ha hecho, ¿en qué categoría caería parte o gran parte de dicha propiedad?

*Perito:*

Inundable por estar cercana al río.

*Tribunal:*

¿Por eso nada más, por estar cercana del río? OJO: El Tribunal cuestionó esa respuesta del perito)

*Perito:*

¿Perdón?

*Tribunal:*

Usted dice que es inundable porque está cercana al río.

*Perito:*

Sí, se ve el cauce de río por la parte ...

*Tribunal:*

Sí, pero eso no quiere, ¿quiere decir que no sea inundable porque esté cerca del río?
...

*Lcdo. José Félix Ramírez:*

Su Señoría, vamos a llevarlo entonces a los mapas que están establecidos en la pared.

*Tribunal:*

*Tiene que dar base.*

*Perito:*

*Sí, cauce de río, lo que yo vi era parte del cauce del río colinda con esto y porque el río cuando crece se desborda."*

El E.L.A. solicitó, entonces, que leyera la colindancia Este de la comparable Núm. 3. de H.P.Y. Expresó lo siguiente el perito:

*"Su señoría, si le, y lo voy a traer en la oportunidad, si se lee detenidamente dicha certificación en la escritura número Seis ante el Lcdo. Sotomayor, José Rafael Sotomayor, él hace una aclaración para decir las nuevas colindancias y establece que es con el río y eso está ahí.*

*Tribunal:*

*Pero, ¿colinda o no colinda con el río?*

*Lcdo. José Félix Ramírez Ramos:*

*Sí, Su Señoría.*

*Lcda. Cinthia Torres Torres (E.L.A):*

*Pero hay que ver la fecha de esa escritura, Vuestro Honor, porque aquí dice que el río se desvió. El cauce del río se desvió y está claro. Esto habla por sí mismo.*

*Lcdo. José Félix Ramírez Ramos:*

*Aguas arriba, Su Señoría, estamos hablando.*

*...*

*Lcdo. Rafael Elvira Caballero (H.P.Y.):*

*Con la inspección ocular ... el Juez podrá cerciorarse de la existencia del cauce del río de las aguas naturales que transcurren en esa área y que todavía al día de hoy usted encuentra problemas con esas aguas. Eso simplemente usted lo podrá apreciar.*

*Tribunal:*

*¿Pero colinda o no colinda?*

*Lcdo. Rafael Elvira Caballero:*

*Sí, Vuestro Honor.*

*Lcda. Edia M. Lebrón (E.L.A.): (Planteamiento del E.L.A)*

*... El cauce es una cosa y el río es otra... El cauce del río continúa siendo cauce a pesar de que se desvíe por el, o sea, el canal por donde discurre el agua y eso como se cambia saca una propiedad de su factor de inundación. O sea, al día de hoy el cauce sigue perteneciendo a la familia Zayas, pero ya no contribuye a que se inunde la finca y eso es lo que hay que ver. No es si colinda o no por colindar es el efecto del cauce y del río como tal en la propiedad...*

*Tribunal:*

*Bueno, yo lo quiero ver para 1988...*

*...*

*Cuál es la posición de la finca con relación al cauce del río.*

*...*

*¿Cuándo se hizo esa escritura?*

*Lcdo. José Félix Ramírez Ramos:*

*El 8 de junio de 1988 prácticamente tres meses antes de la fecha efectiva de tasación y se hace una aclaración en cuanto a las nuevas colindancias y las hace en esta escritura y está plasmada en esa certificación registral, Su Señoría.*

*Tribunal:*

*Sí, pero cuando se hace la aclaración es el 8 de junio ...*

*Lcdo. José Félix Ramírez Ramos:*

*Del 88.*

*Tribunal:*

*Sí, que entonces ya se había desviado ya el río.*

*Lcda. Edia M. Lebrón:*

*Sí*
*Lcdo. José Félix Ramírez Ramos:*

*¿Aguas arriba?*

*Lcda. Edia M. Lebrón:*

*Aguas arriba.*

*Tribunal:*

*Aguas arriba.*

*Lcdo. José Félix Ramírez Ramos:*

*Pero colinda:*

*Lcda. Edia M. Lebrón:*

*No se niega, no se niega va a salir por siempre con el cauce.*

*Tribunal:*

*Bueno, hay que ver si posteriormente hay un mapa de esto que diga que es inundable.*

*Lcda. Edia M. Lebrón:*

*Que la sacó de inundable exacto, ese.*

*Lcdo. José Félix Ramírez Ramos:*

*El mapa lo dice.*

*...*

*Tribunal:*

*Vamos a ver. Con eso lo atamos.*

*...*

*...lo atamos para el lado que sea.*

*Lcda. Edia M. Lebrón:*

*..., lo que realmente queremos que quede aquí claro es que el cauce siempre va a pertenecer a la parte. O sea, el cauce se va a mantener como cauce. Ahora, si efectivamente, si efectivamente las aguas afectan o no la propiedad y la convierten en inundable ...*

*Tribunal:*

*Pues, yo lo entiendo bien.*

*Lcda. Edia M. Lebrón:*

*... es lo que está en controversia.*

*Tribunal:*

*Yo lo entiendo. Porque un cauce puede quedar más abajo o más arriba y un cambio.*

*Lcda. Edia M. Lebrón:*

*Y no se va a cambiar el cauce porque siempre va a ser cauce, el antiguo cauce."*

Por otro lado, el procedimiento seguido por H.P.Y. para que el perito del E.L.A. identificara en los mapas la comparable Núm. 3, resultó ser sumamente confuso. Igualmente, en el contrainterrogatorio del de H.P.Y., el E.L.A. demostró que el procedimiento era poco confiable. Al ser confrontado con la misma situación, éste manifestó la dificultad que existía para ubicar al sujeto en los mapas. *"[E]stamos hablando con escalas diferentes, con mapas diferentes. Yo pude también haberme equivocado ... y haber puesto la flecha donde no era. Pero hay varios mapas ... con la localización."* Transcripción de la vista del 10 de octubre de 2003, testimonio del perito tasador Félix Rodríguez Arroyo, pág. 45.) Véase, además, las págs. 34-39, *"[Y]o le puedo poner el terreno en cualquier sitio, pero ... yo no soy agrimensor, tampoco le puedo decir exactamente si de aquí a aquí hay 100 cuerdas o 25 o 10 o 12 con propiedad porque para eso se necesita ...".*

El testimonio del perito de H.P.Y. tampoco estableció que la comparable Núm. 3 ubica en zona inundable. Únicamente declaró, que era *"inundable por estar cercana al río"* y que no la consideraría por *"el hecho de que al colindar con el río tiene una parte inundable."* Transcripción de la vista del 7 de octubre de 2003, perito tasador Félix Rodríguez Arroyo, págs. 71 y 83.

Al examinar la totalidad de las transcripciones de los testimonios vertidos por los peritos, el expediente y los autos originales del caso, concluimos que la determinación del TPI de que un 50% de la comparable Núm. 3 utilizada para fijar el valor unitario era inundable no se sostiene en la prueba testifical ni en la documental aludida. Consiguientemente, resultaba igual a la propiedad sujeto respecto al factor de inundabilidad, sin necesidad de realizar un ajuste al precio unitario por ello.

De otra parte, el TPI determinó que la comparable Núm. 3 no tenía vista hacia el mar, contrario a la propiedad sujeto que tiene *"una vista imponente hacia el Mar Caribe."* Aunque no hay controversia respecto a que el sujeto la tiene, el E.L.A. sostiene que esa determinación no se ajusta a lo señalado por los peritos en sus informes. Argumenta que el suyo estableció que el factor vista no conlleva un ajuste positivo al valor de la propiedad sujeto porque las ventas del área, a la fecha de la incautación, no reconocen ese factor como un atributo económico. Al respecto éste expresó en su informe que la vista de la propiedad sujeto era *"[h]acia el Mar Caribe, pero el Mercado de Parcelas Similares procedentes de la misma Finca Principal (...), no indican que el valor unitario del metro cuadrado se vea afectado positivamente, por esa amenidad."* Véase, Informe de Tasación, pág. 23.

Añadió que el perito de H.P.Y. no ofreció comparaciones que evidenciaran la disposición para pagar más por el factor vista en el área inmediata de la propiedad sujeto para la fecha de la incautación. Del alegato de H. P.Y. no surge oposición a este señalamiento.

Afirmó que la vecindad demarcada es *"casi toda la zona urbana del Municipio de Ponce porque es donde ubican a veces las ventas comparables que no están en la vecindad inmediata"*. En la vecindad inmediata está el sujeto y su vecindad circundante. Véase, transcripción de la vista del 5 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, págs. 53-54.

En su informe describió la vecindad como *"un conjunto de personas con intereses comunes, tradiciones similares y parecidas posiciones sociales y económicas, radicadas en una extensión geográfica homogénea en cuanto a los usos y tipos de edificaciones. Esta similitud produce el efecto de una uniformidad en los valores debido a que la naturaleza de las propiedades está regida por el potencial de ingresos y niveles culturales y económicos de las familias que componen la vecindad. Diferencias en valores surgen por variaciones físicas entre unas propiedades y otras."* Véase, Informe de Tasación, pág. 11.

Sostuvo que las comunidades que circundan a la propiedad sujeto eran de escasos recursos, por lo cual pagaban precios prácticamente nominales por estructuras bastante pobres. Véase, transcripción de la vista del 5 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 117.

Asimismo, que al 1988 la vecindad inmediata a la propiedad sujeto era una comunidad de invasores establecida y que entendía que no había oportunidad de modificación. Véase, transcripción de la vista del 5 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, págs. 117-118.

Como se ve, surge que la vista hacia el mar no representaba una amenidad para los residentes en el área a la fecha de la incautación. Transcripción 5 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 112.

*"La vista hacia el mar es amenidad para algunas personas, para otras no.*

*...*

*La vista hacia el mar es amenidad para algunas personas, para otras le crea terror, o sea, le crea ... y quien que le da amenidad si es que lo prefiere, son los precios pagados en el mercado por esas propiedades. Y la realidad es que todo lo que se ha vendido y que ha llegado a mi conocimiento porque he tasado con bastante frecuencia en esa zona, es que ... no sé si son por los ingresos o lo que sea, pero no se ve ningún incremento en valor sobre lo típico de la vecindad por tener vista panorámica a la parte baja y a la parte arriba se están vendiendo igual."*

Más adelante, declaró que:

*"..., yo he manejado la parte de ventas comparables en las comunidades aledañas y lo que se está pagando en la parte baja, que no ven hacia el mar porque están, los tapa los edificios de los industriales o Obras Públicas, etcétera, se están pagando similares a los de la parte arriba."*

Transcripción 5 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 116.

El tribunal expresó su sorpresa, declarando *"[q]ue raro eso, verdad."* El perito respondió:

*"No, es que, Vuestro Honor, ¿me permite ampliarle la ... no, es que la comunidad inmediata, esas comunidades son bastante limitadas en recursos, lo que están pagando son prácticamente, no sé, precios nominales, a veces lo que tienen ... hay estructuras de ciento y pico mil dólares, si una que otra habrá, pero ahí la mayor parte de lo que hay son estructuras bastante pobres."*

Transcripción 5 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 117.

Agregó el Juez de instancia en el sentido de que si en el futuro, sin establecer término, un terreno con vista no le daría más valor. A lo que el perito respondió:

*"Bueno, depende de su vecindad inmediata, no podemos comparar esa misma topografía, vamos a decir, esa misma topografía con una vecindad fuera la que tiene físicamente ...".*

Afirmó que se requiere utilizar ventas similares que tengan vista panorámica hacia el mar y ventas que no la tengan, pero similares en el resto de las características, para determinar si la vista es un factor que da más valor a la propiedad. Véase, Transcripción 5 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 119.

Sobre la comparable Núm. 3 sostuvo que la vista era típica de la vecindad inmediata (Cordillera Central). No consideró la vista hacia el mar, en esta comparable, porque *"lo que tiene es un pequeño pedacito ..."*. Sin embargo, estimó que era similar a la propiedad sujeto, porque *"la vista de la propiedad sujeto ..., **a la fecha efectiva de la tasación**, no se reclamaba diferencial por esa característica."* Véase, transcripción 6 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, págs. 68-69.

En el contrainterrogatorio, H.P.Y. le preguntó si en su informe utilizó los criterios de vecindad inmediata y vecindad demarcada. Contestó que consideró ambas. H.P.Y. intentó establecer que no realizó ajuste alguno por el factor vista, aunque la vista panorámica era una característica de la propiedad sujeto.

*"Perito:*

*..., la vecindad demarcada ubica facilidades que contrarrestan la vecindad inmediata.*

*Lic. José Félix Ramírez:*

*O sea lo que usted nos está diciendo es que esas facilidades, esas amenidades, esas características, esos atributos que tiene esa vecindad demarcada, pues se le tiene que atribuir a las ventas comparables que usted utilizó. ¿Eso es correcto?*

*Perito:*

*Correcto.*

*Lic. José Félix Ramírez:*

*... Y a preguntas de la licenciada, usted también en la afirmativa contestó que las ventas comparables utilizadas por el tasador nuestro, señor Félix Rodríguez, también se encuentran dentro de la vecindad inmediata.*

*Perito:*

*Eso es correcto.*

*Lic. José Félix Ramírez:*

*Usted también estableció a preguntas de la compañera que la urbanización, la que conocemos con el nombre de El Monte, está dentro de la vecindad demarcada.*

*Perito:*

*Correcto.*

*Lic. José Félix Ramírez:*

*... También usted nos dijo que en dicha urbanización, es un atributo favorable, o se paga o agrega al precio de venta lo que conocemos como vista panorámica o una vista agradable o vista al mar o vista a los lagos. ¿Es correcto eso?*

*Perito:*

*Depende de la ubicación de la propiedad. Y las ventas que haya en ese momento dado. Se sacan por el ... por estas variables.*

*Lic. José Félix Ramírez:*
*... Usted estableció que en la Urbanización El Monte ese atributo se paga, el de vista panorámica.*

*Perito:*

*Junto con la ubicación.*

*...*

*Supuestamente*

*Lic. José Félix Ramírez:*

*O sea que la contestación es sí.*

*Perito:*

*Si, dentro de las otras, considerando todas las características de la urbanización,*

*Lic. José Félix Ramírez:*

*... Y usted también estableció que el Sujeto, o sea las 90 cuerdas gozan de una vista panorámica al Mar Caribe, ¿eso es correcto?*

*Perito:*

*Tenía vista al Mar Caribe, eso es correcto.*

*Lic. José Félix Ramírez:*

*Una vista panorámica al Mar Caribe, ¿es correcto?*

*Perito:*

*Una vista al Mar Caribe*

*Lic. José Félix Ramírez:*

*¿No es panorámica?*

*Perito:*

*Depende lo que sea panorámica o no es panorámica.*

*Lic. José Félix Ramírez:*

*Ok, eso lo veremos el día de la vista ocular. Sin embargo, usted no hizo ningún ajuste de vista panorámica o vista al mar o vista...*

*...*

*Perito:*

*No, señor.*

*Lic. José Félix Ramírez:*

*No hizo ningún ajuste, pero nos ha contestado que dicha amenidad o dicha dicho atributo la vecindad demarcada goza de ese atributo.*

*Perito:*

*Junto con otras características.*

*Lic. José Félix Ramírez:*

*..., pero el Sujeto no goza de esas características.*

*Perito:*

*Ubica en la vecindad inmediata en una vecindad que tiene las características diferentes.*

*Lic. José Félix Ramírez:*

*Por lo tanto, usted no lo utilizó.*

*Perito:*

*Eso es así. Entonces no demuestra el incremento en valor por esa ...*

*Lic. José Félix Ramírez:*

*Si o no. Ya me dijo que no. Su Señoría, no tenemos preguntas con el testigo. Acabamos nuestro ..."*

Véase, transcripción 2 de julio de 2003, testimonio del perito Isidro Martínez Gilormini, págs. 75-79.

Por su parte, el perito de H.P.Y. Félix Rodríguez Arroyo describió el vecindario inmediato a la propiedad sujeto como uno *"bueno y conducente a un desarrollo unifamiliar."* ... y *"su localización, era bastante privilegiada ...".* Véase, transcripción de la vista del 6 de octubre de 2003, perito tasador Félix Rodríguez Arroyo, pág. 62.

Declaró, además, que realizó un ajuste de 25% por el factor vista en sus comparables. El tribunal le preguntó cómo *"escogió"* el ajuste para sus comparables. Declaró lo siguiente:

*"Perito:*

*..., yo lo escojo por ventas que he visto. Lo que pasa es que encontrar 90 cuerdas que den frente a la playa o tenga una vista comparable al mar no es fácil. Pero entonces si usted conoce de varias que haya visto de diferentes tamaños, sean solares, sean fincas pues uno trata de, hacer una relación cómo se ve la diferencia, sobre todo si está en el mismo sector, ... y en este caso uno no puede circunscribirse pues, vamos a verlo en Ponce sino que yo pude ver ventas de Ponce, si las hubiera habido, ventas de Cabo Rojo, ventas de pueblos costeros con frente de playas y ver cuál era la diferencia, a veces en el mismo sector entre la que está frente y vista al mar o vista al mar contra la que no está."*

*Tribunal:*

*¿Usted no cree que es muy marcado un 25 porciento, cuando el E.L.A. ...?*

*Perito:*

*Yo le diría que estoy bien, bien conservador."*

Transcripción de la vista del 6 de octubre de 2003, perito tasador Félix Rodríguez Arroyo, págs. 81-82.

Podemos apreciar en el testimonio del perito de H.P.Y., que éste no sustentó el factor vista de la propiedad sujeto, según lo requiere el método de ventas comparables el cual requiere que éstas y la propiedad sujeto compartan las características de vecindad tal y como lo sostuvo el perito del Estado. El valor razonable en el mercado de una propiedad expropiada no puede determinarse descansándose para ello en bases inciertas y puramente especulativas. *E.L.A. v. Fonalledas Córdova, supra*, pág. 579. De ahí que es pertinente considerar la similitud en topografía, facilidades, servicios, acceso, ubicación, cabida y el mejor uso de lo expropiado y los bienes comparables. *Pueblo v. Amadeo, supra*, pág. 122; *Estado Libre v. Bravo, supra*, pág. 785, factores éstos que aplicó el perito del Estado.

Más aún cuando el TPI observó que las ventas comparables del perito de H.P.Y. ubicaban *"en el extremo opuesto de la Ciudad de Ponce"* y *"que la superioridad de estas comparables con el sujeto, las hacen incomparables con el mismo."* Por eso las descartó. Apéndice del recurso, págs. 15 y 16. Énfasis suplido.

Al resolver, sin embargo, no consideró el testimonio del perito del E.L.A. sobre el vecindario inmediato de la propiedad sujeto. De su testimonio surge que la vista hacia el mar no representa un atractivo para la vecindad inmediata: *"la vista de la propiedad sujeto ..., a la fecha efectiva de la tasación no se reclamaba diferencial por esa característica."* Véase, transcripción 6 de mayo de 2003, testimonio del perito Isidro Martínez Gilormini, págs. 68-69.

Aunque reconocemos que la vista al mar es un atractivo en muchas localidades, no podemos distanciarnos de la realidad. La propiedad sujeto, aunque la tuviese, no se puede desprender de sus otras características como lo es su topografía escarpada y con depresiones marcadas que limitan su desarrollo y su vecindad circundante compuesto de propiedades de bajo valor económico. Además, que a la fecha que se expropió, ese no era un factor a considerar en el área. Ciertamente, del récord ante nos no se desprende que **el perito Félix Rodríguez Arroyo ofreció comparaciones que evidenciaran la disposición para pagar más por el factor vista en la vecindad inmediata de la propiedad sujeto a esa fecha**. Esto demuestra claramente que el factor vista no se debió considerar para un ajuste de la propiedad sujeto. Menos aún en un 25%.

El peso de la prueba respecto a si el justo valor del bien expropiado es mayor que la suma de dinero consignada en el tribunal por el Estado recae sobre la parte que reclama dicho aumento en valor. *Martínez*

*Rivera v. Tribunal Superior, supra,* pág. 11; *Pueblo v. García, supra,* pág. 508. Era necesario que H.P.Y. demostrara que el factor vista de la propiedad sujeto tenía un efecto positivo sobre el valor, **basado en comparables**, para que el TPI aplicara un ajuste positivo.

Por último, del informe del perito del E.L.A. se desprende que el valor unitario de la comparable Núm. 3 era $12,070 por cuerda. Sin embargo, consideró necesario ajustar el valor a $7,700 por los factores de topografía, cabida, accesos y mejor y más provechoso uso. El total del factor de ajuste que adjudicó el perito fue de 0.6358 (36%).

A base de lo anterior, estableció en $8,500 el valor unitario de la propiedad sujeto. Para llegar a su conclusión utilizó *"el promedio de los valores indicados para cada una de las ventas una vez han sido ajustadas."* (Suma Acumulada de las 5 Comparables utilizadas = $42,700; $42,700. ÷ 5 = $8,540 por cuerda; redondeado al cien más cercano = $8,500 por cuerda.) Véase, *Addendum* al Informe de Tasación del perito tasador Isidro Martínez Gilormini, pág. 49. Además, transcripción de la vista del 27 de mayo de 2003, testimonio del perito tasador Isidro Martínez Gilormini, pág. 47.

El TPI, luego de reseñar la prueba que tuvo ante sí y de hacer constar que consideraba toda la admitida, concluyó que a su juicio el valor justo en el mercado, para noviembre de 1988, de las 90.03 cuerdas de terreno pertenecientes a H.P.Y. era $1,350,045 con un precio unitario de $15,000 por cuerda. Es evidente que utilizó en el cómputo el precio unitario de la comparable Núm. 3 la cual fijó en $12,000 luego de practicar unos ajustes negativos por topografía y acceso. Tomó en consideración que *"el Addendum al Informe de Tasación del Perito del ELA"* lo estableció en $12,070. A esos fines concluyó que era la que mejor representa el sujeto. Añadió que los factores de inundabilidad y vista ameritaban un aumento de $3,000 al precio unitario del sujeto.

Sin embargo, no surge de la totalidad de la prueba presentada que la comparable 3 fuera inundable. El perito del Estado afirmó que no lo era. El de H.P.Y. se limitó a concluir que lo era porque estaba cerca del río.

Estudiada cuidadosamente la prueba ante nuestra consideración entendemos que el récord no sostiene la determinación del TPI en cuanto a que la comparable Núm. 3 era inundable y que la vista al mar, para la fecha de la incautación, tuviese un aspecto positivo que requiriese un ajuste como el realizado.

La prueba analizada por este Tribunal, no establece con claridad que procedía realizar los ajustes positivos a la propiedad sujeto por esos dos factores. Es razonable concluir, pues, que H.P.Y. no cumplió con el peso que le compete para un ajuste positivo de un 25% neto positivo al precio unitario de la propiedad sujeto por el factor vista e inundabilidad a la fecha de la incautación como lo decidió el TPI.

Por los fundamentos antes expuestos, entendemos que se cometió el error señalado. Resolvemos que el valor unitario que debió adoptarse es el de $12,000 por cuerda equivalente al de la comparable Núm. 3 utilizada por el TPI.

Por todo lo antes expuesto, expedimos el auto de *certiorari* presentado por el ELA. Modificamos la resolución recurrida a los fines de establecer el valor unitario del sujeto en $12,000. Remitimos el caso al TPI para que continúe con los procedimientos de forma compatible con lo aquí resuelto. Se ordena la devolución de los autos originales que nos fueran remitidos por dicho foro.

Lo acuerda el Tribunal y certifica la Secretaria del Tribunal de Apelaciones.

Mildred I. Rodríguez Rivera
Secretaria del Tribunal de Apelaciones, Interina